# SHIPMAN *v.* STRAITSVILLE CENTRAL MINING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 306. Argued April 24, 1895. — Decided May 20, 1895.

The fact that no such officer as master commissioner is known to the law does not impair the validity of a reference to a person as such.

The findings of a referee having been ordered to stand as the findings of the court, the only question before this court is whether the facts found by him sustain the judgment.

As the case was not tried by the Circuit Court upon a waiver in writing of a trial by jury, this court cannot review exceptions to the admission or exclusion of evidence, or to findings of fact by the referee, or to his refusal to find facts as requested.

S. and three other parties contracted on the 24th of June, 1879, as follows: "S. agrees to represent the entire interests and sales of the coal of the other three parties aforesaid in the trade that may be denominated the

158 356
L-ed 1015
75f 474

158 356
L-ed 1015
178 364
92f 971
92f 983
f93f 722

158 356
L-ed 1015
f99f 188

158 356
L-ed 1015
105f 871

Detroit trade by rail or by vessel to Detroit, or to and through Detroit, Michigan; that he will confine himself to the use and handling of their coal alone in all his sales of soft coal for whatever use or purpose or market, taking the same from them in equal quantities; that he will turn in all his present trade and orders on their coal at the price of seventy cents per ton at the mines, and that he will take care of all freights and pay them for their coal by the 20th of the month next after each separate month's delivery to him at the mines of said other three parties, and that he will labor to improve the market price of said coal, giving to said parties the advantage of whatever improvement may be made in the market for said coal, asking no greater part of such increase himself than shall be his fair proportion thereof, and that he will keep his books, sales, and contracts of coal all open to their inspection at all times. Said other above-named parties agree to sell coal to no one to conflict with the interests of said S. under this agreement, and that they will aid and encourage the trade of said S. in all lawful ways in their power, so long as he shall confine his sales and operations in soft coal to the product of their mines."

*Held,*

(1) That the contract was a several one as between S. and the three other parties, and that an action would lie in favor of either of those parties without joining the others;

(2) That the agreement included all contracts and orders which S. then had, whether for the immediate or future delivery of coal, but did not bind the other parties to fill contracts made by him subsequent to June 24, at 70 cents per ton;

(3) That the three parties were bound to furnish S. coal to fill contracts made by him for future delivery, at the market price of coal at Detroit at the time Shipman made such contracts, and not at the market price at the time of the delivery of such coal by the companies to Shipman, from time to time, during the existence of such contracts.

THIS was a case originally instituted in the Court of Common Pleas of Franklin County, Ohio, by the defendant in error, to recover a balance of $19,564.89, claimed to be due on account of goods sold and delivered. Upon the petition of Shipman, a citizen of Michigan, the case was removed into the Circuit Court of the United States, where an affidavit was filed, admitting payments by defendant, after the commencement of suit, aggregating $13,017.90, leaving still claimed the sum of $6446.90, with interest thereon.

Defendant filed his answer, setting up a counter-claim, and alleging that the plaintiff had agreed to sell and deliver all the coal from its Sugar Creek lower vein, or so much as defendant

should need for his Michigan trade for one year from the date
of the contract, May 28, 1879, at certain prices; that defend-
ant needed much more coal than was furnished during that
period, and that the price of coal as charged exceeded the
contract price by the sum of $4991.64. The answer further
alleged that, relying on this contract, he agreed to sell coal in
Michigan at prices giving him but a small profit; that he
informed plaintiff of these contracts, and plaintiff agreed
to furnish enough coal to fill them, but failed to do so, by
reason whereof defendant was obliged to purchase of other
parties at higher prices than those at which plaintiff had
agreed to sell, whereby he suffered damages in the sum of
$10,000, in addition to the overpayment above mentioned.

Plaintiff replied to this answer, denying the counter-claims
set up by the defendant, and admitting the payment of
$13,017.90 since the commencement of suit.

Somewhat more than eighteen months thereafter, defend-
ant filed an amended answer, reiterating his former defences,
and increasing the amount claimed for damages and counter-
claim to $20,921.11.

Plaintiff filed a reply to this amended answer, claiming that
on June 24, 1879, defendant entered into an agreement which
abrogated the agreement of May 28, 1879, under which de-
fendant claimed. That this agreement was entered into
between Shipman on the one part, the Straitsville Coal
Company, the Straitsville Central Mining Company, and
J. S. Doe & Co. of the other part; and that it was understood
thereby that this contract superseded all other contracts be-
tween the parties relating to the coal trade. That, by its
terms, plaintiff was to furnish one-third of the coal called for,
and no more, at the market price for such coal for the time
being at its mines, except so far as the defendant's then
present trade and orders were concerned, which were to be
filled at the price to him of seventy cents per ton at the mines,
each of the parties to the agreement furnishing one-third of
the coal necessary therefor.

This contract, the construction of which is the material feat-
ure of this case, is as follows:

" O. W. Shipman, Straitsville Coal Co., Straitsville Central Mining Company, and J. S. Doe & Co. agree with each other as follows :

" Shipman agrees to represent the entire interests and sales of the coal of the other three parties aforesaid in the trade that may be denominated the Detroit trade by rail or by vessel to Detroit, or to and through Detroit, Michigan; that he will confine himself to the use and handling of their coal alone in all his sales of soft coal for whatever use or purpose or market, taking the same from them in equal quantities; that he will turn in all his present trade and orders on their coal at the price of seventy cents per ton at the mines, and that he will take care of all freights and pay them for their coal by the 20th of the month next after each separate month's delivery to him at the mines of said other three parties, and that he will labor to improve the market price of said coal, giving to said parties the advantage of whatever improvement may be made in the market for said coal, asking no greater part of such increase himself than shall be his fair proportion thereof, and that he will keep his books, sales, and contracts of coal all open to their inspection at all times. Said other above-named parties agree to sell coal to no one to conflict with the interests of said Shipman under this agreement, and that they will aid and encourage the trade of said Shipman in all lawful ways in their power, so long as he shall confine his sales and operations in soft coal to the product of their mines.

" Given under our hands this 24th day of June, A.D. 1879."

[Signed.]

By consent of parties in open court an order was entered June 18, 1883, referring the case for trial to Richard A. Harrison, " a master commissioner of this court," who was directed to report the testimony with his findings of fact and of law, separately stated, to the court.

In December, 1884, the referee made a finding of facts, and propounded to the court five questions of law upon such facts,

viz. : (1) Whether the contract of June 24, 1879, superseded that of May 28. (2) Whether such contracts were joint or several. (3) As to the meaning of the clause " that he will turn in all his present trade and orders on their coal at the price of seventy cents per ton at the mines." (4) Whether the three companies were required to furnish defendant coal to fill contracts made by him for future delivery, at the market price of coal in Detroit at the time defendant made such contracts, and not at the market price at the time such coal was actually delivered by the plaintiff to the defendant. (5) Whether the contract was terminable at the will of either party.

Answers were made to these questions by the court, and on May 23, 1886, the referee made his report, applying the law as declared by the court, and awarding the plaintiff the sum of $230.74, with interest from August 1, 1880. In the meantime defendant had filed a second amended answer, to which plaintiff replied, and to a portion of this reply defendant demurred.

Both parties excepted to the findings of the referee. The court passed upon the exceptions, reconsidered the questions of law submitted by the referee, reaffirming the answers given, except to the fourth question, declaring that the former answer to this question was wrong, giving a new answer, and recommitting the case to the referee.

December 13, 1889, the referee filed a supplemental report, applying the interpretation of the contract given by the court to the facts as found, and finding the amount due plaintiff to be $9282.81. This report was approved and confirmed, and it was ordered that the findings of the master stand as the findings of the court. Thereupon the court gave judgment for the plaintiff in the sum of $9282.81, with interest from December 3, 1889. Defendant subsequently procured a bill of exceptions to be settled, and sued out a writ of error from this court.

Mr. Frederic D. McKenney for plaintiff in error. Mr. Alfred Russell and Mr. E. L. DeWitt were on his brief.

Mr. J. Holdsworth Gordon for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. This case was referred by consent to Mr. Harrison, a so-called "master commissioner," as referee, with instructions to report the testimony, with the findings of fact and of law, to the court. The fact that no such officer as master commissioner is known to the law does not impair the validity of the reference, as it is perfectly competent for the court to refer a case to a private person. *Heckers* v. *Fowler*, 2 Wall. 123. And, as the court in its judgment ordered his findings to stand as the findings of the court, the only questions before this court are whether the facts found by the referee sustain the judgment. As the case was not tried by the Circuit Court upon a waiver in writing of a trial by jury, this court cannot review exceptions to the admission or exclusion of evidence, or to findings of fact by the referee, or to his refusal to find facts as requested. *Roberts* v. *Benjamin*, 124 U. S. 64; *Boogher* v. *Insurance Co.*, 103 U. S. 90; *Bond* v. *Dustin*, 112 U. S. 604; *Paine* v. *Central Vermont Railroad Co.*, 118 U. S. 152; *Andes* v. *Slauson*, 130 U. S. 435.

There are eighteen assignments of error, but as most of them are taken to the action of the referee, they need not be further noticed.

2. The court below was of opinion that the contract in question was a several one as between Shipman and the three other parties, and hence that an action would lie in favor of either of these parties without joining the others. Three separate actions were in fact brought against him. There is nothing in the contract indicating that the three parties were connected in any way, except that each was to furnish an equal quantity of coal. They are spoken of in the contract as " the other three parties," as if it were intended that each of them should stand for himself. If either of them had failed to furnish his quota of coal, Shipman might have brought an action against him; but it is clear that if he had sued them jointly for such default, the two others might answer that they had done all that they agreed to do, and

could not be held liable for the default of the third.  These
parties did not agree to furnish any definite amount of coal,
but merely that they would ship the defendant the product of
their mines in equal quantities.   Separate orders were given
by Shipman, and separate bills were rendered by the com-
panies for coal shipped upon such orders ; and there is nothing
to indicate that either of the parties to the contract treated
it as involving a joint liability.   *Hall* v. *Leigh*, 8 Cranch, 50.
If Shipman had settled with plaintiff according to the account
rendered by it in this case, it seems to us that it could not be
seriously contended that the other parties could not sue him
for the coal furnished by them without joining the plaintiff.

3. The principal controversy in this case, however, grows
out of that clause of the contract which requires of Shipman
" that he will turn in all his present trade and orders on their
coal at the price of 70 cents per ton at the mines."   In this
connection, the referee asked the advice of the court, as to
whether this meant that the three companies should furnish
coal at 70 cents per ton at the mines, to fill only such orders and
contracts as Shipman then had, (June 24, 1879,) for *immediate*
delivery of coal ; or, that they should furnish it at that price
to fill all such contracts and orders, whether for immediate
*or future* delivery ; or, whether they should furnish it to fill
all contracts which Shipman then had, or might thereafter
make, before the market price of coal advanced, with parties
who had previously been customers of his ; and, whether this
was limited to those who were previously customers of his or
not.

The fourth question put by the referee was whether, view-
ing all the provisions of the contract, the companies were
required to furnish Shipman coal to fill contracts made by
him for future delivery at the market price of coal in Detroit
at the time Shipman made such contracts, and not at the
price at the time such coal was actually delivered by the
plaintiffs to Shipman from time to time during the existence
of such contracts.

The court answered the third question that the clause
quoted included all contracts and orders, which Shipman then

had, whether for the *immediate* or *future* delivery of coal, but did not bind the companies to fill contracts made by Shipman subsequent to June 24, at 70 cents per ton. It at first answered the fourth question, that the three companies were bound to furnish Shipman coal to fill contracts made by him for future delivery, at the market price of coal at Detroit at the time Shipman made such contracts, and not at the market price at the time of the delivery of such coal by the companies to Shipman, from time to time, during the existence of such contracts. Upon the basis of these answers, the referee found a balance of $230.74 due from the defendant to the plaintiff, with interest from August 1, 1880.

Exceptions were taken by both parties to the report of the referee, when the court, reaffirming its answers to the first, second, and third questions, reached the conclusion that the answer to the fourth question was wrong, and that the true answer was that, excepting contracts within the designation of "present trade and orders," which the contract of June 24, 1879, required Shipman to turn in at the price of 70 cents per ton at the mine, the three companies named in the contract were not bound to furnish him coal to fill contracts made by him for future delivery at the market price of coal at Detroit at the time when Shipman made such contracts, but that they were entitled to the market price at the date of the actual sale of such coal by them to Shipman, less his "fair proportion" of any advance in the price, as specified in the contract.

In determining the correct answer to this question, it is proper to consider the situation of the parties and the surrounding circumstances. For some years prior to June 24, 1879, defendant Shipman had been extensively engaged in the business of buying and selling coal in the Detroit market, and had from time to time purchased considerable coal for that market from the plaintiff. The two other parties to the contract had also, prior to such date, established a coal office in Detroit and competed with Shipman for the Detroit trade. At the date of this written contract, and for some time before and since then, there existed at Detroit a usage or custom

among coal dealers and their larger customers to make con-
tracts for the sale and delivery of coal at a stipulated price
for the year next ensuing, and this usage or custom was known
to all the parties to this contract when they entered into it.
At the date of this contract the price of lump coal was 70
cents, and of nut coal 25 cents per ton, at the mines. After
the execution of this contract the three respectively shipped
coal to defendant at Detroit, and to his customers on his
orders, and separate accounts were kept both by Shipman
and the plaintiffs respectively of the coal shipped by each.
Monthly bills were rendered by them respectively to defend-
ant, in which they charged for the coal shipped prior to Oc-
tober 1, 1879, at the rate of 70 cents for lump and 25 cents for
nut coal, and for all coal, both lump and nut, shipped after
October 1, 1879, bills were rendered to defendant at the
market price, which was largely in excess of 70 and 25 cents.
There appears to have been a slight advance in coal at the
mines some time in July or August, and in the account ren-
dered in August by the plaintiff, defendant was charged 75
cents per ton for lump coal. He called the attention of the
company to the fact, and the company, in the September
account, credited the defendant with the 5 cents per ton
overcharge.

As the contract made no mention of the price to be charged,
except so far as concerned coal furnished to fill orders in exist-
ence at the time of the contract, it would follow that the
plaintiff was at liberty to charge the defendant the current
market price at the mines at the time of each delivery. In
view, however, of the custom of the coal trade at Detroit to
make contracts for the sale and delivery of coal at a stipulated
price, for the year next ensuing, and in view of the fact that
this custom was known to all the parties to this contract at
the time they entered into it, it may fairly be presumed that
the contract was made with reference to that custom. The
fact that the companies reserved to themselves the power to
inspect defendant's books, sales, and contracts for coal at all
times, while the contract remained in force, is somewhat
inconsistent with the idea that they had no interest in any

contracts made by him after June 24, and only contemplated selling him at the market price. The fact that he had agreed to labor to improve the market price of coal, giving the other parties the advantage of whatever improvement might be made in the market, to which the companies were to lend their aid and encouragement, tends to show that the relations between them were different from those between an ordinary vendor and vendee. Indeed, the fact that the contract provides that he was to represent the entire interests and sales of the companies in the Detroit trade; that he could only sell soft coal received from them; that he was to labor for the improvement of the market, and if he succeeded in raising the price, that he was to receive only a fair proportion of such increase, indicates rather the relation of partners or of principal and agent than that of vendor and vendee. If this were the case, the companies would be bound by his contracts, made within the scope of his authority and according to the custom of the Detroit trade. It can hardly be supposed, under this contract, that if Shipman were to make an agreement, say July 1, 1879, to deliver one thousand tons during the next year at a given price, and coal was to rise immediately thereafter, he would be obliged to pay the companies the increased price, and still sell to his customers at the contract price — in other words, to sustain the whole loss himself; inasmuch as he was representing their interests in Detroit, was obliged to submit to them his books and contracts for their inspection, and in case of an improvement in the market was obliged to account to them for their fair proportion of the increase. On the other hand, if coal fell after the contract was made, and it had proved to be a profitable one, it would seem to have been the expectation of the parties that he should only receive his fair proportion of such profit.

It is unnecessary to characterize or define this contract or to say whether it created the relation of vendor and vendee, principal and agent, or a partnership, as it possesses some features characteristic of each of them. But, although it is very ambiguous and indefinite, and was evidently not drawn

by any one learned in the law, we think the answer first given by the court to the fourth question corresponds better with its true meaning and intent, and that the companies were bound to furnish defendant coal to fill contracts for future delivery at the market price of coal in Detroit at the time he made such contracts.

So far as Shipman's "fair proportion" of an increase is concerned, we see no distinction between nut and lump.

This covers all the questions properly raised by the record in this case, and the result is that the judgment of the court below must be

*Reversed, and the case remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision of this case.