## Richmond.

### VIRGINIA BLACK MOUNTAIN COAL CO., INC., v. VIRGINIA-LEE COMPANY AND OTHERS.

#### March 14, 1912.

1. CONTRACTS—*Joint or Several.*—Whether a contract is joint or several, or joint and several, depends upon the intention of the parties as ascertained from the contract as a whole construed by the ordinary rules of construction. When several persons engage for the performance of distinct and several duties, mere words of plurality will not make the contract joint.

2. CONTRACTS—*Joint or Several—Case at Bar.*—Where several coal companies, owning separate and distinct mines in the same field, but having no joint or common interest, enter into contracts with the same sales agent, wholly separate and distinct in form, though identical in terms, for the purpose of controlling and marketing the output upon an equitable basis promotive of the interests of all, and to prevent injurious competition, the contracts are several, and are not converted into a joint contract by a clause declaring that "this agreement is to be construed as though all the parties to said agreements had executed one and the same agreement."

Error to a judgment of the Circuit Court of the city of Norfolk in an action of assumpsit. Judgment for the defendants. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Williams & Tunstall* and *Frick & Williams*, for the plaintiff in error.

*Irvine & Morison*, for the defendant in error.

The declaration is as follows:

"Virginia Black Mountain Coal Company, Incorporated, a

corporation organized and existing under the laws of the State of Virginia, the plaintiff in this action, complains of the Virginia–Lee Company, Incorporated, a corporation organized and existing under the laws of the State of Virginia, Bondurant Coal and Coke Company, Incorporated, a corporation organized and existing under the laws of the State of Virginia, and the Black Mountain Mining Company, a corporation organized and existing under the laws of the State of Virginia, the defendants, of a plea of trespass on the case in assumpsit, for this—to-wit: That heretofore—to-wit, on the 29th day of November, A. D. 1909—the said defendants were indebted to the said plaintiff in the sum of seventy thousand ($70,000) dollars for the price and value of work before that time done by the plaintiff for the defendants at their special instance and request; and also in the sum of seventy thousand ($70,000) dollars for money before that time lent by the plaintiff to the defendants at their special instance and request; and also in the sum of seventy thousand ($70,000) dollars before that time paid by the plaintiff for the use of the defendants at their special instance and request; and also in the sum of seventy thousand ($70,000) dollars for money before that time had and received by the defendants to the use of the said plaintiff. And, being so indebted, the said defendants, in consideration thereof, afterwards—to-wit, on the day and month and year aforesaid—undertook and faithfully promised the said plaintiff to pay it the said several sums of money in the above counts mentioned, when the said defendants should be thereunto afterwards requested.

"And for this, also, that heretofore—to-wit, on the day, month, and year last aforesaid—the said defendants accounted with the said plaintiff of and concerning divers other sums of money before that time due and owing to the said plaintiff, and then in arrears and unpaid; and, upon such accounting, the said defendants were found in arrears and indebted to the said plaintiff in the further sum of seventy thousand ($70,000) dollars, and, being so found in arrear and indebted, they, the said defendants, in consideration thereof, undertook and then faithfully promised the said plaintiff to pay it the said sum of money in this count last mentioned when they, the said defendants, should be thereunto afterwards requested.

"And for this, also, that heretofore—to-wit, on a certain day, to-wit, on the 11th day of March, A. D. 1909—the said defendant, the Virginia–Lee Company, with J. D. Palmerlee and C. K. Mount, executed a certain paper writing, which said paper writing is in words and figures as follows—to-wit:

" 'This agreement, made and entered into (in duplicate) this, the eleventh day of March, 1909, by and between Virginia–Lee Company, Incorporated, a corporation organized and existing under the laws of the State of Virginia, party of the first part, and J. D. Palmerlee and C. K. Mount, of Norfolk, Va., partners under the name of Black Mountain Coal Company, hereinafter referred to as party of the second part—witnesseth:

" 'That the parties to this agreement, for and in consideration of the mutual covenants and agreements herein expressed and set forth, and for other good and valuable consideration, have respectively agreed as follows—to-wit:

" 'First. That the party of the first part agrees to deliver, for sale, during the continuance of this agreement, to the party of the second part, on railroad cars at the mines of the party of the first part, all the coal produced by its said mines, located in the Black Mountain District, Lee county, Virginia, after deducting the amount of coal used for domestic and steam purposes in and about its own mines, and any coal that the said party of the first part may desire to use in making coke at its said mines, and after deducting any coal excepted in clause 12 of this agreement.

" 'Second. The party of the second part agrees to accept all the coal delivered to it by the party of the first part, and to pay the party of the first part, on the 15th day of each month, the amount due for the coal delivered during the previous calendar month, which amount shall be determined as hereinafter set forth, less 10 *per cent.* of the said amount, which is to be given to the party of the second part for its commission, costs, and expenses of selling, which are accepted by it as in full of such.

" 'Third. The amount to be paid to the party of the first part by the party of the second part, on the 15th day of each month, to be ascertained as follows:

" 'The party of the second part is to average the prices which it has received per ton for each grade of coal and from each seam

or vein separately, delivered to it by the party of the first part, and all other mines having contracts identical with this one, and is to pay the party of the first part the net average prices obtained therefor, after deducting the said 10 *per cent.* commission above provided for.

" 'Fourth. The party of the first part is to deliver to the party of the second part a clean and merchantable coal, free from slate, bone, or other impurities, and to be thoroughly screened and prepared according to sizes ordered, and the standard of grade and inspection determined upon and adopted by the second party to govern. The party of the second part agrees to establish an office at St. Charles, Virginia, for receiving and shipping coal, and to thoroughly inspect said coal prior to billing the same, and shall issue a certificate to the party of the first part, covering each car received, setting forth the grade and weight of such car, and the said certificate shall be final in settlement between the parties hereto. A competent inspector shall be appointed by the party of the second part, who shall be acceptable to a majority in interest of the mining companies entering into this and similar agreements, such majority to be determined in accordance with section nine hereof; and said inspector may be discharged at any time for cause, either by the party of the second part or by a majority in interest of said mining companies, as aforesaid. One half the salary of the said inspector shall be paid by the party of the second part and the other half shall be paid by the said mining companies. The proportion to be paid by each company is to be determined, as aforesaid, in accordance with section nine hereof. The whole salary to be paid by the said party of the second part, and each company's proportion of said one half to be deducted upon each monthly settlement.

" 'Fifth. In determining the rights and dues of the parties to this agreement, the weights as returned by the initial railroads are to be accepted as final by both parties hereto, and a ton as used herein is to be construed to mean 2,000 pounds.

" 'Sixth. The party of the second part shall endeavor, at all times, to secure a sufficient car supply, but, in the event of a car shortage, the available supply shall be pro-rated among the several mines having identical contracts herewith with the party of the

second part, on a basis of their respective capacities, which capacities are to be determined as hereinafter set forth in clause nine.

" 'Seventh. The party of the first part agrees to meet, from time to time, at the request of the party of the second part, or any of the other mining companies entering into a similar contract with this one, with representatives of such other mining companies in the Black Mountain field, for the purpose of determining minimum prices at which coal may be sold for any stated period, and said party of the first part agrees to accept the prices so fixed by majority vote; the value of the vote of each representative to bear the same proportion to the total vote cast that the capacity of such representative's mines bears to the total capacity of all the mines so represented.

" 'Eighth. At any time when market conditions necessitate curtailing output, in order to dispose of the coal mined, the party of the first part agrees to curtail the output of its mines as may be necessary, and in like proportion with all other mines under similar contracts herewith with the party of the second part, on a basis of their respective capacities.

" 'In the event the party of the second part shall fail to procure orders for all the coal the party of the first part can produce, then the party of the first part shall, after ten days' written notice to the party of the second part, and to the other mining companies entering into agreements similar to this, have the right to sell its surplus output, but not at less than the minimum price established, and it shall not book orders for a period exceeding thirty days ahead, except to railway companies operating in the Black Mountain field, and to such companies orders shall not be booked for a period exceeding six months ahead.

" 'Ninth. The capacity of the mines of the party of the first part, along with the capacities of the other mines entering into agreements similar to this, shall be determined as required by law by the railroads entering the Black Mountain field in conjunction with the operators of the said mines, and the said party of the second part shall be governed by the capacities as thus fixed; but if any difference arises among the said operators as to the capacity of any mine, the party aggrieved shall give ten days' notice in writing to the other operators entering into such agreements, and the

question of capacity shall thereupon be submitted to arbitrators. The local division superintendent of the Louisville and Nashville Railroad and the local division superintendent of the Virginia and Southwestern Railway, for the time being, or of the successors of the said railroads, shall be, and they are hereby, constituted permanent arbitrators for the said parties, and these two shall select a third arbitrator, and the decision of any two of the board so constituted shall be final and binding on all parties.

" 'Tenth. The party of the second part shall advertise and sell the said coal under a suitable trade-name, to be copyrighted, if possible, in order to establish for it an identity with the trade; but seam No. 5, now being mined in the said field, shall be copyrighted and sold under a separate trade-name; and if hereafter other seams in the said field are mined and sold under this agreement, such other trade-name or trade-names as may be deemed best may be adopted for the same. The party of the second part shall seek to market said coal where, by reason of its special qualities and high efficiency, the best prices can be obtained, and shall, at all times, use its best efforts to sell the complete output of the party of the first part at the best prices obtainable therefor.

" 'Eleventh. The party of the second part guarantees to the party of the first part the payment in full for all coal that is delivered to it under the terms of this agreement, and if full settlement is not made by the party of the second part at any time within thirty days after the same shall be due, in accordance with the terms of this agreement, the party of the first part may, at its option, cancel the same.

" 'Twelfth. Notwithstanding anything herein contained, all contracts of the party of the first part, for the sale of coal, which are now in force, shall be reserved from the operation of this agreement, but, upon the execution hereof, said party of the first part is to deliver to the party of the second part copies of such contracts, and, after the same have expired, no renewals thereof are to be made except by the party of the second part. And, further, the party of the first part is to have the privilege, for a period not exceeding one year from and after date thereof, of selling, free from the terms of this agreement, to the Louisville and Nashville and Virginia and Southwestern Railroad Companies,

coal for their engines, and, if at any time during the said year the party of the second part can market the grade of coal so sold to the Louisville and Nashville and Virginia aud Southwestern Railroad Companies at a price to net the party of the first part as much as the amount received from said Louisville and Nashville and Virginia and Southwestern Railroad Companies, then the party of the second part is to have the privilege of selling the same, if allowed to do so by the contract with the said Louisville and Nashville and Virginia and Southwestern Railroad Companies.

" 'Thirteenth. It is further agreed that neither the party of the first part, as a corporation, nor any officer thereof or stockholder therein shall, directly, or indirectly, own or be interested in the stock or management of the party of the second part.

" 'Fourteenth. The party of the first part shall have the right at any time to examine the books of the party of the second part, in order to satisfy itself that the amounts received by it for coal delivered to the party of the second part are the proper amounts.

" 'Fifteenth. In case any dispute shall arise between the parties hereto, otherwise than is provided for in clause nine hereof, it is mutually agreed that such dispute shall be adjusted by arbitration, each party hereto choosing one disinterested arbitrator, and the two so chosen to select the third, and the award of any two of said arbitrators shall be final and binding upon both parties hereto.

" 'Sixteenth. This agreement shall continue in full force for a period of three years from and after the first day of April, 1909, and shall continue beyond said period subject to the right of either party hereto to terminate the same upon sixty days' written notice to the other.

" 'Seventeenth. It is understood that agreements identical with this, except as to names of parties, will be executed and delivered simultaneously with the execution and delivery of this agreement with other mining companies operating in the Black Mountain field of Lee county, Va., and this agreement is to be construed as though all of the parties to said agreements had executed one and the same agreement.

" 'In testimony whereof, the parties hereto have caused these

presents to be signed by their respective presidents and their corporate seals to be hereunto affixed, duly attested by their respective secretaries, this, the day and year first above written. (Signed) Virginia–Lee Company, Incorporated, by J. M. Barr. J. D. Palmerlee.    C. K. Mount.'

"And the said Bondurant Coal and Coke Company and the said J. D. Palmerlee and C. K. Mount, on the day and year last aforesaid, executed a paper writing identical with the one herein above set out, except as to the name of the party of the first part therein; and on the day and year last aforesaid the defendant, the Black Mountain Mining Company, and the said J. D. Palmerlee and C. K. Mount, also executed a paper writing identical with the one herein above set out, except as to the name of the party of the first part, which said paper writings were deposited in escrow until a corporation could be formed to take over the rights and assume the obligations of the said C. K. Mount and the said J. D. Palmerlee under the terms of the said writing, and the said J. D. Palmerlee and the said C. K. Mount then and there entered into a contract with the said defendants in words and figures as follows—to-wit:

" 'This agreement, made this the 11th day of March, 1909, by and between the Virginia–Lee Company, Incorporated, the Bondurant Coal and Coke Company, Incorporated, and the Black Mountain Mining Company, Incorporated, all three being Virginia corporations, parties of the first part, and J. D. Palmerlee and C. K. Mount, of Norfolk, Virginia, parties of the second part— witnesseth:

" 'That whereas each of the respective parties of the first part have entered into separate agreements with the said Palmerlee and Mount, with reference to a sales agency of coal from the mines of the first parties, in the Pocket, Lee county, Virginia, which agreements are identical, except as to names, and all bear date thereof, and are to be considered as a part of this agreement as fully as if each one thereof were spread at length herein, and

" 'Whereas the said agreements are the result of negotiations extending over several months last past, in which it was contemplated that the said Palmerlee and Mount should organize a corporation as a sales agency, controlled by them, with sufficient

financial strength to satisfy the respective parties of the first part herein, but owing to the continued financial depression they have been unable to do so, and

" 'Whereas, it is thought to be for the interest of all parties herein to vary the terms of the said identical agreements as is set forth herein, but not in other respects,

" 'Now, therefore, it is agreed:

" '(1) That the parties of the second part herein will, until the first day of August, 1909, prosecute the business of selling the coal of the mines of the first parties, in accordance with the terms and conditions of the aforesaid identical agreements, and the parties of the first part hereby agree to allow them to do so, and said identical agreements shall be in full force and effect between the parties hereto, except as modified by this agreement.

" '(2) The sales made by the second parties for the first parties during said period shall be for and on account of the said first parties collectively, and all remittances shall be made direct by customers to a trustee, to be named by the first parties, whose duty it shall be to collect same and pay to each of the first parties its proportion, as arrived at under the said identical agreements, and to the second parties their commissions each month. The second parties are to use all proper care in making good orders, but losses, if any, are to be borne by the first parties ratably, under the aforesaid agreements.

" '(3) The second parties, during the said period, shall use the partnership name of the Black Mountain Coal Company, and shall have checks made payable to W. T. Goodloe, treasurer of said company, who is hereby designated as trustee for the first parties for the purpose set out in the last foregoing paragraph.

" '(4) The aforesaid agreements, after being properly executed by all the parties, are to be delivered, in duplicate, to R. T. Irvine, attorney at law, Big Stone Gap, Virginia, and by him held during the period covered by this supplemental agreement, and for the purposes thereof, and if, on or before the first day of August, the parties of the second part shall organize a corporation with sufficient capital and resources to satisfy the parties of the first part, then the parties of the second part shall have the right to assign the said agreements to the said corporation, and be relieved of

any further liabilities thereunder upon the said corporation's assuming all the obligations and duties of the said identical agreements, and thereupon the said Irvine shall deliver the said agreements to the respective parties entitled, and after the said date the original agreements shall be in full force and effect, the same as if executed and delivered on this date, but if, by the first day of August, 1909, the parties of the second part shall not have succeeded in organizing a corporation satisfactory to the first parties, as aforesaid, then this agreement shall terminate, and the aforesaid identical agreements shall not be delivered, but shall be void. Collections and settlements, however, shall continue after the first day of August, covering sales made prior thereto, until the whole of such business shall be wound up, in accordance with the terms hereof; and the parties of the first part may, at any time, name a new trustee in the place of the said Goodloe.

" 'Witness the following signatures, this the day and year first above written. [Signed] Virginia–Lee Company, Incorporated, by W. G. Wigton, Manager. Bondurant Coal and Coke Company, Incorporated, by C. W. Bondurant. Black Mountain Mining Company, Incorporated, by R. T. Irvine. J. D. Palmerlee. C. K. Mount.'

"And, subsequently, on a certain day—to-wit, on the 26th day of August, A. D. 1909—the said J. D. Palmerlee and the said C. K. Mount, by and with the consent of the said defendants and each of them, assigned to the above-named plaintiff all of their rights and interests under said paper writings and under certain contracts that had been entered into with the defendants, and others for the sale of coal, all of which contracts had been made in pursuance of the said agreements, and the said defendants, and each of them, caused the said paper writings to be delivered to this plaintiff, and the said defendants, jointly and severally, then and there contracted and agreed with the plaintiff according to the terms of the said paper writings above set out, this plaintiff then and there taking over all the rights and advantages and assuming all the obligations of the said C. K. Mount and the said J. D. Palmerlee, as set out in the said paper writings and the said contracts, and the said defendants, jointly and severally, agreeing thereto, became and were jointly and severally bound to this

plaintiff by the terms of the said paper writings, in consideration of the mutual promises and agreements in the said paper writings contained, as fully and effectually as though the said paper writings had been then and there executed with this plaintiff, naming this plaintiff, instead of the said C. K. Mount and J. D. Palmerlee, as the party of the second part.

"And, in pursuance of its duty under the terms and provisions of said contract with the said defendants, this plaintiff proceeded, with the utmost diligence, to carry out and perform all and singular the covenants and agreements in said contract mentioned to be performed and carried out by this plaintiff until this plaintiff was prevented from so doing by the defendants wrongfully and illegally refusing to carry out their part of the said contract, by neglecting and refusing to fill orders for coal sent by the plaintiff to said defendants; by selling their coal to other parties, and refusing to account for the commissions due on the same to the plaintiff; by selling their coal to other parties at prices lower than the prices given to this plaintiff; by selling their coal to other parties under the pretense that it was sold, under the terms of  *  *  *  the said contract, to the railroad companies named therein; by fixing a minimum price for this plaintiff which was above the market price; by refusing to fix a minimum price in accordance with the then existing market conditions; by not preparing the said coal, as the contract required, in accordance with the orders sent in; by delivering unmerchantable coal; by unreasonable delays in shipment, and by failing and refusing to fix properly the various percentages of the different grades of coal making up the output of the mines of the defendants, and, finally, by repudiating the said contract, and refusing to fill any orders for coal sent to the said defendants by this plaintiff.

"And, in pursuance of its duty to carry out the said terms of said contract to be performed by this plaintiff, the said plaintiff expended large sums of money in renting, equipping, and maintaining its offices, in organizing its corps of employees, and in keeping its salesmen traveling and soliciting orders for the coal produced and to be produced by the defendants, and by such expenditures, and the efforts of its expert salesmen, this plaintiff succeeded in building up an ever-increasing business, and had built up a large

and lucrative business, and was able to find sale for the output of the mines of the said defendants, as required by the said contract, and could have so done during the contract period, when the said defendants, and each of them, on or about the 29th day of November, A. D. 1909, unmindful of their promises and the agreements in the said contract contained and to be performed by them, but contriving and craftily intending to deceive and defraud the said plaintiff in this behalf, did not, or would not, when so requested by this plaintiff, fill the orders for coal sent to them by and through this plaintiff, utterly repudiating said contract and refusing to fill any orders for coal sent them by this plaintiff, and refused to pay to this plaintiff commissions on coal which had been sold, but which the defendants had neglected to ship after the orders therefor had been sent in to them by this plaintiff, and refusing to allow proper rebates upon unmerchantable and improperly prepared coal which had been shipped by the said defendants, and, by repudiating said contracts, prevented and prohibited this plaintiff from making the commissions provided by the terms of the said contract for the sale of the output of the said mines from the time of such repudiation up to the end of the period during which the plaintiff should, under the terms of the said contract, have had the right to sell the coal of the said defendants, as provided by the terms of the said contract. Wherefore, the said plaintiff says that it has sustained damages by reason of the said divers breaches of the said several promises and undertakings in the said contract to be performed by the said defendants, to the amount of seventy thousand ($70,000) dollars, and therefore it brings its suit."

KEITH, P., delivered the opinion of the court.

The Virginia Black Mountain Coal Company brought an action of *assumpsit* against the Virginia–Lee Comapny, the Bondurant Coal and Coke Company, and the Black Mountain Mining Company, to recover damages for a breach of contract. The Virginia–Lee Company appeared and pleaded the general issue; the other defendants appeared and filed pleas in abatement, in each of which it is averred that the supposed cause of action arose upon a several

and not upon a joint agreement. The question was submitted to the court, which, having considered the questions of law and fact arising upon these pleas, was of opinion that the law was with the defendants, sustained the pleas, and abated the suit as to the Black Mountain Mining Company and the Bondurant Coal and Coke Company; and thereupon the Virginia Black Mountain Coal Company applied for and obtained a writ of error.

At the threshold it is to be observed that there were three contracts entered into and set forth in the declaration. In the first contract the Virginia–Lee Company is named as party of the first part, in the second the Black Mountain Mining Company is the party of the first part, and in the third the Bondurant Coal and Coke Company is the party of the first part. In all of them the Virginia Black Mountain Coal Company is named as the party of the second part. There is no single paper writing containing the contract executed by all the parties, but, while the contracts are identical in terms, they are in form wholly separate and distinct, the one from the other.

The incorporated companies named as parties of the first part owned and operated coal mines in one of the coal fields of Wise county. Their ownership of these mines was wholly separate and distinct. There was no joint, no common, interest, and the contracts seem to have been entered into merely for the purpose of controlling and marketing the output, upon an equitable basis promotive of the interests of all, and to prevent injurious competition. There was a certain community of interest which was to be subserved, and to this end the contracts were entered into, and a common agent appointed to superintend their execution. The contracts entered into were intended not only to regulate the duties and obligations of the parties as between the agent and the mining companies, but also the duties and obligations of the mining companies *inter se*, so that no advantage might be taken the one of the other, and their general interests promoted and subserved.

The contracts, which, as we have said, are identical, consist of seventeen paragraphs or sections, many of which plainly contemplate individual action, and are seemingly inconsistent with the idea of joint obligation. In the second paragraph, for instance,

it is provided that the party of the second part agrees to accept all the coal delivered to it by the party of the first part, and to pay the party of the first part, on the 15th day of each month, the amount due for the coal delivered during the previous calendar month. Suppose the party of the second part had paid to one of the coal companies its share of the proceeds of coal delivered, but had not settled satisfactorily, or had not settled at all, with one or both of the other companies. Can it be contended that the three companies must have united in a suit to compel a settlement? Or, conversely, suppose one or two of the companies had delivered coal in accordance with the contract. Can it be maintained that the company which had settled in accordance with the terms of its contract would have been suable and compelled to make good the delinquency of the defaulting company or companies?

The coal companies, under the fourth clause, were to deliver clean and merchantable coal, free from slate or other impurities, and suppose one of the companies, fraudulently or negligently, failed in the performance of this duty?

Take the sixth paragraph, where the party of the second part, the plaintiff in error here, undertakes to secure a sufficient car supply, and so discharges that function as to be satisfactory to one or more of the companies. Should a suit for a violation of that duty be instituted by the party which was satisfied and sustained no injury, as well as by that which had been wronged?

Take the eleventh paragraph, where the party of the second part, the plaintiff in error here, guarantees to the party of the first part the payment in full for all coal delivered to it under the terms of this agreement, and if a full settlement is not made by the party of the second part within thirty days from the time the same is due, the party of the first part may, at its option, cancel the agreement. Two of the coal companies may have been satisfied; two of them may have been willing to condone the default; but the third would still have the arbitrary right to cancel the contract if it saw fit.

Whether a contract is joint or several, or joint and several "depends upon the intention of the parties, as ascertained from the contract, by the ordinary rules of construction." Page on Contracts, sec. 1132.

In section 672 of Beach on Modern Law of Contracts, it is said: "Whether the contract is joint or several, or joint and several, is one of intention. The contract must be considered as a whole, and if, upon such consideration, the intention of the parties becomes apparent, it must prevail over the literal interpretation of detached words, phrases, and clauses. A contract which is plainly meant to be several is not to be treated as joint merely because several persons have signed it on one side or the other. When persons engage for the performance of distinct and several duties, mere words of plurality, such as 'we bind ourselves,' will not make the contract joint."

In *Shipman* v. *Straitsville Cent. Mining Co.*, 158 U. S. 356, 39 L. Ed. 1015, 15 Sup. Ct. 886, Shipman was the sales agent for the coal of three mining companies. The agency contract was evidenced by one contract, in which all united, instead of three separate agreements as in the case before us, between the agent and the principals. There were a number of mutual duties, similar to those in this case. Shipman, the sales agent, committed a breach of his contract, and each of the three mining companies brought separate actions against him for damages, and he raised the point that it was a joint contract, and there could be only one suit, in which the three companies must be joint plaintiffs. Mr. Justice Brown said: "There is nothing in the contract indicating that the three parties were connected in any way, except that each was to furnish an equal quantity of coal. They are spoken of in the contract as 'the other three parties,' as if it were intended that each of them should stand for himself. If either of them had failed to furnish his quota of coal, Shipman might have brought an action against him; but it is clear that, if he had sued them jointly for such default, the two others might answer that they had done all that they agreed to do, and could not be held liable for the default of the third. These parties did not agree to furnish any definite amount of coal, but merely that they would ship the defendant the product of their mines in equal quantities. * * * If Shipman had settled with plaintiff according to the account rendered by it in this case, it seems to us that it could not be seriously contended that the other

parties could not sue him for the coal furnished by them without joining the plaintiff."

In that case the contract was evidenced by one instrument of writing. Here there are three instruments, identical, it is true, in terms, in each of which the producing company is described as the party of the first part and the sales agent as the party of the second part.

It is true that by paragraph seventeen it is declared that "this agreement is to be construed as though all the parties to said agreements had executed one and the same agreement"; but that language is insufficient to convert into a joint agreement what, in its nature, appears plainly to be a several undertaking. It cannot be that language of doubtful import would have been employed when, if such had been the purpose, it could have been accomplished by simply declaring that the parties intended to enter into a joint obligation.

We are of opinion that there is no error in the judgment, and it is affirmed.

*Affirmed.*