**W. C. SHEPHERD CO., Inc. et al. v. ROYAL INDEMNITY CO.**

No. 13561.

United States Court of Appeals
Fifth Circuit.

Nov. 23, 1951.

Russell, Circuit Judge, dissented.

Allen E. Lockerman, Atlanta, Ga., for appellants.

Elbert P. Tuttle, Madison Richardson, Atlanta, Ga., for appellee.

Before McCORD, RUSSELL and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This suit is for repayment of advances totaling $533,526.97, made under a written contract between Eagle Indemnity Company (alleged to be the predecessor of Royal Indemnity Company, the appellee) and W. C. Shepherd Co., Inc., the repayment of which was guaranteed by W. C. Shepherd. The court struck the answer and counterclaim of the Shepherd Company and entered judgment for the amount of the advances together with interest. It is conceded that the correctness of the judgment against Shepherd individually depends upon the correctness of the judgment entered against the Shepherd Company.

The Shepherd Company was a large contractor operating in six states. Eagle Indemnity Company executed performance

bonds on numerous construction jobs of the Shepherd Company. In 1948 the Shepherd Company was in need of funds. It owed approximately a half million dollars in debts of various kinds. It applied to Eagle for a loan.

A written agreement was entered into dated May 28, 1948, by which Eagle agreed to lend money to pay certain classes of the Shepherd Company's bills arising out of performance of its bonded construction jobs, upon conditions set forth in the agreement.

The question to be decided on this appeal is whether the court erred in striking either the answer or the answer and counterclaim of the Shepherd Company. The decision of that question depends mostly upon the true meaning and construction of the agreement of May 28, 1948.

That agreement referred to the Shepherd Company as "Contractor" and to Eagle as "Surety" and recited the existing circumstances of the parties. The Contractor had entered into contracts with the Federal Government, various states, municipalities, public bodies, individuals and corporations. The Surety had executed its surety bonds on behalf of the Contractor as principal and in favor of certain owners or obligees, which bonds guaranteed the performance of the bonded contracts by the Contractor. Under some of the contracts the bonds also guaranteed the payment by the Contractor of the moneys due for labor, materials and supplies in connection with the performance of the contracts. The contracts had not been completely performed. Certain bills and obligations of the contractor for materials, supplies and similar charges of subcontractors incurred to date in connection with the performance of the contracts had not been paid. The contract further recited that it was entered into "in consideration of the premises and the *mutual covenants* hereinafter contained." (Emphasis supplied.)

The obligations of the Contractor under this written contract were extremely definite. It agreed to execute, and in fact contemporaneously with the contract, did execute a general power of attorney authorizing the Surety to do and perform all acts, deeds, and things which, in the exclusive judgment of the Surety, might be deemed expedient in or about the performance, completion and acceptance of all the bonded contracts. That power of attorney was made irrevocable according to its terms. The Contractor further agreed to execute, and in fact contemporaneously with the contract did execute, an assignment to the Surety of all moneys due or to become due under all of the bonded contracts. In the contract itself, the Contractor further granted, sold, assigned, and transferred unto the Surety all of its right, title, and interest in all of its property, chattels and equipment wheresoever located, subordinate and subject only to liens theretofore created.

The contract further provided that the Contractor would close out any and all bank accounts then maintained, except those bank accounts maintained solely for meeting payrolls, and would transfer any moneys on deposit to an account in the Fulton National Bank, Atlanta, Georgia designated "W. C. Shepherd Co., Inc. (Eagle Indemnity Company, W. C. Shepherd Company, Inc., agent) Job—Special Account". All moneys paid by the owners or obligees under the bonded contracts and all moneys derived from any source thereunder, including sales of materials, supplies, equipment and machinery were to be deposited in said Job Account. All payments from said Job Account were to be made only by checks signed by a representative of the Contractor and countersigned by a representative of the Surety.

The contract further provided that from the moneys deposited or to be deposited in the Job Account the Contractor would, if and as authorized by the Surety, pay for all labor and materials, all amounts due to subcontractors, for rental, maintenance or operation of equipment and all other expenses directly attributable to the performance of the contracts. It was further provided that "The order of priority of any of the aforesaid payments shall be determined by the exigencies of the situation at the time of payment and by the decision of the Surety thereon".

The Contractor further agreed, when and as requested by the Surety, to curtail, limit or abolish expenditures of any nature, to discharge any employee or agent, to reduce salaries or wages, to effect reductions in the amount of rent payable for offices and plant and generally to exercise economies of every nature in the operation of the Contractor's business.

All moneys in excess of the obligations of the Contractor and/or Surety under the bonded contracts were to be paid to the Surety in reimbursement of advances made by the Surety and in payment of three per cent interest on said advances.

The Contractor further agreed that until all of the bonded contracts had been fully performed and final settlement made thereon the Contractor would not enter into any other contract or perform any work for itself or others under any other contract.

The Contractor agreed to hold the Surety harmless in the following terms: "The contractor will protect and save harmless the Surety of and from all costs, expense, loss or damage in connection with or resulting from any matter or thing referred to in this Agreement and will repay to the Surety all moneys expended by the Surety under this Agreement and in connection with all of the Bonded Contracts (including those contracts not bonded by the Surety) plus interest at 3%."

The obligations imposed upon the Surety by the terms of the contract of May 28, 1948, and upon which the issues of this case focus attention, are contained in one paragraph only, reading in pertinent part as follows: "From and after the date of this Agreement the Surety intends from time to time to advance or make available the moneys necessary for the payment, adjustment or discharge of the outstanding unpaid bills of the Contractor for materials, supplies and similar subcontractor's charges heretofore incurred in the performance of the Bonded Contracts, and intends to advance such further moneys as may be required for the payment of bills incurred by the Contractor subsequent to the date hereof in the performance of the Bonded Contracts.

Said moneys will be deposited by the Surety at such times and in such amounts as the Surety may deem advisable to preclude the further impairment of the Contractor's credit and for other reasons of job economy and efficiency * * *".

Coming now to consider the sufficiency of the answer and counterclaim, paragraph 5 of the complaint reads as follows: "Effective June 30, 1950 Eagle Indemnity Company, also a resident and inhabitant of the State of New York, was legally merged into Royal Indemnity Company, and Royal Indemnity Company thereupon became the legal succession to Eagle Indemnity Company, and all rights, franchises and interests of Eagle Indemnity Company in and to every species of property, real, personal and mixed and things in action, vested in Royal Indemnity Company."

The answer to that paragraph is in the following words: "This defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5."

Rule 8(b) of Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part that if a party "is without knowledge or information sufficient to form a belief as to the truth of an averment, he shall so state and *this has the effect of a denial*". (Emphasis supplied.) Barthel v. Stamm, 5 Cir., 145 F. 2d 487.

It may be argued that the effect of this denial is overcome by the averments of the counterclaim reading in part as follows: "The counterclaim herein set forth is asserted against Royal Indemnity Company as successor by merger to Eagle Indemnity Company and the statements made in paragraph 5 of plaintiff's complaint are adopted by reference and made a part hereof."

Rule 8(e) (2), Federal Rules of Civil Procedure, provides in part that "A party may also state as many separate claims or defenses as he has regardless of consistency. * * *". See Carroll v. Morrison Hotel Corp., 7 Cir., 149 F.2d 404, 408.

We conclude that under the answer, before the appellee, Royal Indemnity Com-

pany, could have become entitled to judgment, it must have offered some proof that it had succeeded by merger to the rights of Eagle Indemnity Company. This it failed to do.

Paragraph 9 of the complaint reads as follows: "At the request of said defendants, Eagle Indemnity Company has expended to discharge obligations of the defendant corporation incurred by it in the performance of certain construction projects on which Eagle Indemnity Company had issued performance bonds as contemplated in the indemnity agreements (Exhibits A and B) and the agreement (Exhibit C) and in the performance of other projects, a sum, which, after the application of proceeds from the several jobs, left at the date of the filing of this complaint a net deficiency owed by the corporate defendant to the complainant of $533,526.97. An itemized statement of the said amount by jobs is attached hereto and marked Exhibit D to this complaint."

The answer to that paragraph reads as follows: "Answering paragraph 9, this defendant admits that at the time the complaint herein was filed, Eagle Indemnity Company had paid out the approximate sum of $533,526.97 in connection with contracts referred to in Exhibit D, but defendant denies each and every other allegation in said parapraph."

That answer denies all of the allegations of paragraph 9 of the complaint except that Eagle Indemnity Company had paid out the approximate sum of $533,526.97 in connection with the contracts. It denies that the net deficiency owed by the Shepherd Company to the appellee was $533,526.97. Paragraph 25 of the complaint alleges that the Shepherd Company and Shepherd individually had repeatedly recognized the correctness of the amount of the indebtedness. This allegation the defendants specifically deny. For reasons already stated, the denial of a part of paragraph 9 and of paragraph 25 is not overcome by the concession in the counterclaim that appellee is entitled to credit for this sum of $533,-526.97.

The answer further alleges that the loss suffered by Eagle was due entirely to its own breach of the written contract, and the counterclaim seeks to recover from the appellee an additional $361,000.03, together with interest, as damages caused by alleged breach of the contract on the part of Eagle.

The only provision of the contract that might impose any obligation on Eagle is paragraph numbered second, which has been heretofore quoted. The meaning of that paragraph is the most important question in this case.

The answer and counterclaim alleges that the agreement of May 28, 1948, "was drafted, drawn, and prepared in its entirety" by Eagle. Hence if that contract is ambiguous it should be construed most strongly against Eagle. E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228, 89 A.L.R. 238; Calhoun v. Lemon, 192 Ga. 186, 14, S.E.2d 710, 711; 17 C.J.S., Contracts, § 324, page 751.

If the times and amounts of deposits to be made by the Surety were left to the uncontrolled discretion of the Surety then there was no contract notwithstanding other parts of the written agreement referred to "mutual covenants hereinafter contained", and notwithstanding that, as we have seen, the obligations of the Contractor were definite in the extreme. "A promise to give anything whatever which the promisor may choose, or to do or give something whenever the promisor pleases, is illusory, for such promises would be satisfied by giving something so infinitely near nothing or by performance so infinitely postponed as to have no calculable value". 1 Williston on Contracts (Rev. Ed.) Sec. 43, at p. 126; see 12 Am.Jur. Contracts, Sec. 66.

As said in the comment to Section 32 of the Restatement of the Law of Contracts: "Promises may be indefinite in time or in place, or in the work or things to be given in exchange for the promise. In dealing with such cases the law endeavors to give a sufficiently clear meaning to offers and promises where the parties intended to en-

ter into a bargain, but in some cases this is impossible."

A construction which renders the contract valid will be preferred to one which renders it void. E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228.

What is called the cardinal rule of construction has been well stated by the Court of Appeals of Georgia in the following language: "The cardinal rule of construction, to which all others are subordinate, is to ascertain the intention of the parties, and, in order to do this, the language of the agreement should be considered in the light of the attendant and surrounding circumstances. The court should place itself as nearly as possible in the situation of the parties in seeking the true meaning and the correct application of the language of the contract." Aetna Life Ins. Co. v. Padgett, 49 Ga.App. 666, 176 S.E. 702, 703; Liverpool & London & Globe Ins. Co. v. Georgia Auto & Supply Co., 29 Ga.App. 334, 115 S.E. 138; see also 17 C. J.S., Contracts, § 321, page 746; Miller v. Miller, 10 Cir., 134 F.2d 583, 588.

A further rule of construction is stated in 1 Williston on Contracts (Rev.Ed.) Section 47:

"A promise is not too indefinite if it can be made certain by reference to outside matters.

"It is not necessary that a promise should within itself be certain if it contains a reference to some document, transaction, or other extrinsic facts from which the meaning may be made clear". See also 12 Amer.Jur. p. 559, Contracts, Sec. 68; Electrical Research Products v. Gross, 9 Cir., 86 F.2d 925, 929; Phillips Petroleum Co. v. Rau Construction Co., 8 Cir., 130 F.2d 499, 501; Bryant v. Hayes, 63 Ga.App. 440, 11 S.E.2d 360, 362; McCaw Mfg. Co. v. Felder, 115 Ga. 408, 41 S.E. 664; Tampa Shipbuilding & Engineering Co. v. General Construction Co., 5 Cir., 43 F.2d 309, 311, 85 A.L.R. 1178; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F. 2d 224, 228, 89 A.L.R. 238; British American Oil Producing Co. v. Buffington, 5 Cir., 116 F.2d 363, 365; Asher v. Ruppa, 7 Cir., 173 F.2d 10, 12.

In Shipman v. Straitsville Central Mining Co., 158 U.S. 356, 15 S.Ct. 886, 39 L. Ed. 1015, an agreement to furnish all coal needed to fulfill existing contracts with the buyer's customers was held sufficiently definite.

In speaking of a contract to lend money Judge Pound said in Eaton v. Reich, 258 N. Y. 202, 179 N.E. 385, 387: "It is elementary that 'a breach of contract to make a loan, standing by itself, involves no legal damage'. * * * One man's money was as good as another's. An inability to obtain the money elsewhere may have caused the corporation special damage, but no peculiar circumstances are disclosed which suggest that fact."

In 5 Williston on Contracts (Rev.Ed.), p. 3932, Sec. 1411, it was said with reference to a breach of a contract to lend money: "It will frequently happen that the borrower is unable to get money elsewhere, and, if the defendant had notice of the purpose for which the money was desired, he will be liable for damages caused by the plaintiff's inability to carry out his purpose, if the performance of the promise would have enabled him to do so."

The Contractor and the Surety were both interested in avoiding losses under the bonded contracts. It would have been obviously wrong for the Surety to accept a transfer of all of the Contractor's rights and property and thus disable the Contractor from paying its past obligations and from performing its bonded contracts, and then for the Surety to assume no obligation to aid the Contractor in the discharge of its debts and the performance of its bonded contracts. If the contract should be so construed it would be a fraud upon the existing creditors of the Contractor and upon those to whom both it and the Surety were bound under the bonded contracts. The Surety does not contend for such an unfair construction. Its counsel state in brief:

"That paragraph (second paragraph of contract) imposes on Eagle the obligation

to make a loan to pay two classes of bills and, at times, as provided therein.

"With respect to the *amounts* to be advanced, it is the money necessary to pay:

"(a) unpaid bills of the Shepherd Company, then outstanding, for materials, supplies and similar subcontractor's items, incurred in the performance of the bonded contracts; and

"(b) unpaid bills of the Shepherd Company, thereafter incurred, in the performance of the bonded contracts to the extent that further advances may be required, 'said' moneys to be advanced at times provided."

We agree with the foregoing construction by appellee of part of the second paragraph of the contract. The word "moneys" as thrice employed in the paragraph was made sufficiently definite by reference to the then unpaid bills of the Contractor and to the bills to be incurred by the Contractor subsequently in the performance of the bonded contracts.

Any uncertainty as to whether the word "intends" in the second paragraph imposed an obligation on the Surety is dispelled when we come to the unequivocal statement that *"Said moneys* will be deposited by the Surety". (Emphasis supplied.)

As we have previously mentioned, the appellee concedes that the second paragraph of the contract imposed on Eagle the obligation to make a loan to pay the two classes of bills. The appellee insists, however, that the answer and counterclaim fail to allege a duty upon Eagle under the written agreement to advance any sum in excess of the $533,526.97 admittedly advanced. It is true that the answer is not very specific in claiming that Eagle failed to pay any bill for which it was obligated under the contract. However paragraph 18 of the answer does allege that a judgment for $10,000.00 has been obtained against the Shepherd Company and that this indebtedness should have been paid by Eagle from funds that were to be deposited under the contract in question.

Paragraph 28 of the answer makes the following among other allegations: "Notwithstanding the necessity of maintaining good credit with the suppliers of materials and parts necessary for the completion of said jobs, Eagle Indemnity Company, although repeatedly requested to do so by this defendant, failed and refused to advance sufficient moneys to enable the work to be carried on in an efficient and economical manner. * * *"

Paragraph 30 of the answer and paragraph 5 of the counterclaim allege in general terms that Eagle breached the contract.

The more substantial claim of the Shepherd Company, though not alleged as clearly as might be desired, is that Eagle breached the contract through its delay in depositing the amounts aggregating the total of the loan. The appellee insists that the times and amounts in which the moneys were to be deposited were left in the absolute uncontrolled discretion of the Surety.

We have quoted from the sentence in the second paragraph of the contract beginning "Said moneys will be deposited by the Surety". That sentence continues "at such times and in such amounts as the Surety may deem advisable to preclude the further impairment of the Contractor's credit and for other reasons of joint economy and efficiency." That clause, it seems to us, refers to the deposits of the advances in such installments as would make up the moneys agreed to be deposited by the Surety. The times and amounts of such installments were made definite in some degree by the requirements of moneys to pay existing bills and bills subsequently incurred in the performance of the bonded contracts. These were matters as to which both the Contractor and the Surety were already bound to existing creditors and to obligees under the bonded contracts.

The contract of May 28, 1948, between the Contractor and the Surety was expressed by its terms to be "solely for the benefit of the Contractor and the Surety and no other than they shall have any right, privileges, interest, or causes of action,

legal or equitable, hereon." Among the main benefits which the Contractor might anticipate from that contract were the prevention of the further impairment of its credit, and the financial ability to perform the jobs economically and efficiently. By the terms of the contract the times and amounts of the several advances were left to the Surety's discretion. That discretion, however, was not an uncontrolled one. Both the Surety and the Contractor were bound to realize that to carry out their pre-existing obligations that discretion must be exercised in such manner as would satisfy creditors and obligees under the bonded contracts. For the benefit of the Contractor, it seems to us, it was further provided that that discretion should be exercised in a manner which the Surety "may deem advisable to preclude the further impairment of the Contractor's credit and for other reasons of job economy and efficiency.[1]

That is "advisable" which is expedient, prudent and proper to be done. Barrett v. Bloomfield Savings Institution, 64 N.J.Eq. 425, 54 A. 543, 549; Marquette Trust Co. v. Doyle, 176 Minn. 529, 224 N.W. 149, 151; Water Works Board of City of Mobile v. City of Mobile, 253 Ala. 158, 43 So.2d 409, 411.

In the times and amounts of the deposits the Surety owed a duty to the Contractor not to act arbitrarily but instead reasonably to carry out the declared objects "to preclude the further impairment of the Contractor's credit and for other reasons of job economy and efficiency". If the Surety acted arbitrarily or unreasonably in the exercise of its discretion as to the times and amounts of the deposits it would be liable to the Contractor for any loss proximately resulting from such misconduct.

The agreement of the Contractor to "protect and save harmless the Surety" which has been heretofore quoted should not be construed to indemnify the Surety against losses resulting from its own wrongdoing. Southern Bell Telephone & Telegraph Co. v. Mayor and Board of Aldermen, 5 Cir., 74 F.2d 983, 984, 985; Employers Casualty Company v. Howard P. Foley Co., 5 Cir., 158 F.2d 363, 364; Halliburton Oil Well Cementing Company v. Paulk, 5 Cir., 180 F.2d 79; Martin v. American Optical Company, 5 Cir., 184 F.2d 528; 27 Am.Juris., Indemnity Sec. 15, p. 464.

The appellee insists that the answer and counterclaim fail to allege a duty upon the part of the Surety to make advancements at any particular time or times different from the times when the advancements were actually made. We have quoted enough of the Contractor's answer to show that it makes a justiciable issue on the question of the Surety's alleged delay in making the advances. Other parts of the answer assert that "any loss which Eagle may have suffered by reason of sums which it ultimately paid out, was due entirely to its own breach of said agreement and plan, and to the negligent and inefficient manner in which it insisted that said jobs be completed." And still other parts refer to Eagle's assertion that it "could do as it pleased with this defendant", and to its conduct of operations under the contract "in a careless and negligent manner in wanton disregard of the rights of this defendant." It must be conceded that the answer is not in as specific terms as might be desired. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires". In this case we think

---

[1]. We do not stop to inquire whether, even if the contract were not so specific as to benefits to the Contractor, the assumption by the Surety of the decision as to times, amounts, and priorities of payments of obligations owed by the Contractor did not create a status out of which would arise a duty to use good faith or reasonable diligence somewhat analogous to the duty of a casualty liability insurer with respect to trial or settlement of cases against its insured. See American Mutual Liability Ins. Co. v. Cooper, 5 Cir., 61 F.2d 446, 447; Home Indemnity Co. v. Williamson, 5 Cir., 183 F.2d 572, 578; Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co., 1 Cir., 240 F. 573, 579, 580; 8 Appleman on Insurance, Secs. 4712, 4713; 29 Am.Jur., Insurance Sec. 1079.

718

that the ends of justice would be better served by affording the appellants an opportunity to amend their answers. Watson v. Cannon Shoe Co., 5 Cir., 165 F.2d 311, 313; Marranzano v. Riggs National Bank, 87 U.S.App.D.C. 195, 184 F.2d 349; Downey v. Palmer, 2 Cir., 114 F.2d 116.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

RUSSELL, Circuit Judge (dissenting).

I find in the allegations of the answer and counterclaim no basis for permitting the substitution of the retrospective "discretion" of the Court and jury for the discretion which the lender is granted by the terms of the contract as to the time and circumstances of the advancements which it assumed to make. The answer and counterclaim show no breach of any duty assumed by the lender. The request for opportunity to amend to present contentions not pressed in the trial Court does not even now clearly inform us of terms contemplated to be alleged, other than that the "financial help given by the Eagle Company was not given in sufficient time [immediately] and that this was a breach of the contract." The contract will not support this defense and claim and we should not wait until the termination of a long and expensive trial to so declare. I am also of the opinion that the majority incorrectly interprets the effect of the "save harmless" provision of the contract. The principle ruled in the cases cited is sound law and properly applicable when an indemnitee seeks to transfer his own liability to a third person to the indemnitor, but is not applicable in the determination of liability between the parties arising in the course of such dealings as the contract now under consideration contemplates. The correct principle is that we applied in Phillippine Air Lines v. Texas Engineering & Mfg. Co., 5 Cir., 181 F.2d 923, 925.

I think the trial Court correctly entered judgment on the pleadings, and therefore respectfully dissent from the judgment of reversal.