72 U.S. 377 (____)
5 Wall. 377
THE WILLIAM BAGALEY.
Supreme Court of United States.

*380 Messrs. Henry Crawford, S.S. Cox, and J.J. Lewis, for the appellants and for the petitioners.
*399 Mr. Ashton, Assistant Attorney-General, contra.
*402 Mr. Justice CLIFFORD delivered the opinion of the court.
The steamer and cargo were captured as prize of war on the 18th day of July, 1863, and, having been duly libelled and prosecuted as such in the District Court, on the 17th day of August following, they were both condemned as forfeited to the United States. Monition was duly published, but no one appeared as claimant, either for the steamer or cargo. Directions of the decree of condemnation were, that the steamer and cargo, after ten days' public notice, should be sold by the marshal, and that the proceeds of the sale should be deposited in the registry of the court for distribution, according to law. Return of the marshal shows that the notice was duly given, and that the sale was made as directed by the decree. Proceeds of the sale were paid to the marshal, but before the amount was actually deposited in the registry of the court the appellant filed his petition of intervention, claiming one-sixth of the proceeds, upon the ground that he was the true and lawful owner of one-sixth part of the vessel and cargo. Allegations of the petition of intervention were, in substance and effect, as follows:
*403 1. That the petitioner was, and for many years had been, a citizen of the State of Indiana; that at the breaking out of the rebellion he was a member of the firm of Cox, Brainard & Co., at Mobile, Alabama; that the partners of the firm, as such, were the sole owners of the steamer and cargo; and that he had never parted with his share or in any way transferred his interest in the partnership
2. That the steamer, after the rebellion broke out to the time of the capture, was continually in the waters of the rebellious States, and under the control and management of those engaged in the rebellion, which rendered it impracticable and unlawful for him to proceed to the place where the steamer was, or to exercise any control over the steamer or any part of the partnership property.
3. That he was, and always had been, a true and loyal citizen; that he had never given any aid, encouragement or assistance to the rebellion, and that he had no connection with, or knowledge of, the unlawful voyage of the steamer on account of which she was condemned as lawful prize.
4. That some court of the Confederate States, so called, at some time in the year 1862, had condemned and confiscated his interest in the partnership, but he averred that the decree was wholly nugatory and void, and that his interest in the steamer and cargo had never been extinguished or destroyed.
Basing his claim upon these allegations of fact, he prayed that he might be paid out of the proceeds of the sale one-sixth of the amount required to be paid into the registry of the court.
Exceptions were filed to the petition of intervention, but they were overruled by the court, and the District Attorney appeared and admitted that all the facts therein alleged were true. Parties were heard as upon an agreed statement, and the District Court entered a decree that the intervention and claim of the petitioner be rejected and dismissed, with costs. Appeal was taken by the intervenor from that decree, and he now seeks to reverse it, upon the ground that he, as *404 owner of one-sixth part of the steamer and cargo, is entitled to one-sixth of the proceeds of the sale.
1. Captors contend that the steamer and cargo were both rightfully condemned as enemy property, and also for breach of blockade. Appellant denies the entire proposition as respects his interest in the captured property, and insists that the one-sixth of the same belonging to him cannot properly be condemned on either ground, because he was never domiciled in the rebellious States, and because he never employed the property, either actually or constructively, in any illegal trade with the enemy, or in any attempt to break the blockade.
Projected voyage of the steamer was from Mobile to Havana, and the master testified that she sailed under the Confederate flag. Proofs show that she left her anchorage in the night-time, and that she was captured, as alleged in the libel, after a brisk chase by several of our blockading squadron, more than two hundred miles from the port of departure. When captured, she had on board a permanent register, issued at Mobile under Confederate authority, and which described her owners as trustees of a certain association, and citizens of the Confederate States.
Testimony of the master showed that the cargo, which consisted of seven hundred bales of cotton, three thousand two hundred staves, and one hundred and twenty-five barrels of turpentine, was consigned to parties in Havana, and that the shipment was for the benefit of owners residing at the home port. Except an informal manifest, the steamer had no papers on board relating to the cargo, and the master testified that she carried none for the consignee; "for fear of being captured." He was appointed by the trustees, and he also testified that his instructions were to elude the blockading vessels if possible, but not to resist in case he was unable to escape. Ship's company consisted of thirty men, and all the officers and crew, with one exception, were citizens of the enemy country. Direct admission is made by the master in his testimony that he stole out of the harbor, and that the steamer and cargo were captured for breach of *405 blockade. Such an admission was hardly necessary to establish the charge, as every fact and circumstance in the case tended to the same conclusion. Five-sixths of the steamer and cargo were confessedly enemy property, and the whole adventure was projected and prosecuted for the benefit of resident enemy owners. None of these facts are controverted by the appellant, but he insists that inasmuch as he was domiciled in a loyal State, and had no connection with the adventure or the voyage, his interest cannot properly be held liable to capture.
2. War necessarily interferes with the pursuits of commerce and navigation, as the belligerent parties have a right, under the law of nations, to make prize of the ships, goods, and effects of each other upon the high seas. Property of the enemy, if at sea, may be captured as prize of war, but the property of a friend cannot be lawfully captured, provided he observes his neutrality. Public war, duly declared or recognized as such by the war-making power, imports a prohibition by the sovereign to the subjects or citizens of all commercial intercourse and correspondence with citizens or persons domiciled in the enemy country.[*]
Neutral friends, or even citizens, who remain in the enemy country after the declaration of war, have impressed upon them so much of the character of enemies, that trading with them becomes illegal, and all property so acquired is liable to confiscation.[]
Part-owners of ships are seldom partners in the commercial sense, because no one can become the partner of another without his consent, and because if they acquire title by purchase, they usually buy distinct shares at different times and under different conveyances, and even when they are the builders they usually make separate contributions for the purpose. Generally speaking, they are only tenants in *406 common; but the steamer, in this case, belonged to the partnership, and throughout the rebellion to the time of capture was controlled and managed by the partners in the enemy country.[*]
Even where the part-owners of a ship are tenants in common the majority in interest appoint the master and control the ship, unless they have surrendered that right by agreeing in the choice of a ship's husband as managing owner.[]
Admiralty, however, in certain cases, if no ship's husband has been appointed, will interfere to prevent the majority from employing the ship against the will of the minority without first entering into stipulation to bring back the ship or pay the value of their shares. But the dissenting owners, in such a case, bear no part of the expenses of the voyage objected to, and are entitled to no part of the profits. Such are the general rules touching the employment and control of ships; but unless the co-owners agree in the choice of a managing owner, or the dissenting minority go into admiralty, the majority in interest control the employment of the ship and appoint the master.[]
Tenants in common of a ship can only sell their own respective shares, but where the ship belongs to a partnership one partner may sell the whole ship.[§]
3. Proclamation of blockade was made by the President on the nineteenth day of April, 1861, and on the thirteenth day of July, in the same year, Congress passed a law authorizing the President to inderdict, by proclamation, all trade and intercourse between the inhabitants of the States in insurrection and the rest of the United States.[]
Provision of the sixth section of the act is, that after fifteen days from the issuing of such proclamation, "any ship or vessel belonging in whole or part to any citizen or inhabitant" of a State or part of a State, whose inhabitants shall *407 be so declared to be in insurrection, if found at sea or in the port of any loyal State, may be forfeited. Reference is made to those provisions, as showing that our citizens were duly notified that Congress as well as the President had recognized the undeniable fact that civil war existed between the constitutional government and the Confederate States; and that seasonable notice was given to all whose interests could be affected, and that ample opportunity and every facility were extended to them, which could properly be granted, to enable them to withdraw their effects from the States in rebellion, or to dispose of such interests as in the nature of things could not be removed.
Open war had existed between the belligerents for more than two years before the capture in this case was made, and yet there is not the slightest evidence in the record that the appellant ever attempted or manifested any desire to withdraw his effects in the partnership or to dispose of his interest in the steamer. Effect of the war was to dissolve the partnership, and the history of that period furnishes plenary evidence that ample time was afforded to every loyal citizen desiring to improve it, to withdraw all such effects and dispose of all such interests. "Partnership with a foreigner," says Maclachlan, "is dissolved by the same event which makes him an alien enemy;" and Judge Story says, "that there is in such cases an utter incompatibility created by operation of law between the partners as to their respective rights, duties, and obligations, both public and private, and therefore that a dissolution must necessarily result therefrom, independent of the will or acts of the parties."[*]
Executory contracts with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are ipso facto dissolved by the declaration of war, which operates to that end and for that purpose with a force equivalent to that of an act of Congress.[]
*408 Duty of a citizen when war breaks out, if it be a foreign war, and he is abroad, is to return without delay; and if it be a civil war, and he is a resident in the rebellious section, he should leave it as soon as practicable and adhere to the regular established government. Domicile in the law of prize becomes an important consideration, because every person is to be considered in such proceedings as belonging to that country where he has his domicile, whatever may be his native or adopted country.[*]
4. Personal property, except such as is the produce of the hostile soil, follows as a general rule the rights of the proprietor; but if it is suffered to remain in the hostile country after war breaks out, it becomes impressed with the national character of the belligerent where it is situated. Promptitude is therefore justly required of citizens resident in the enemy country, or having personal property there, in changing their domicil, severing those business relations, or disposing of their effects, as matter of duty to their own government, and as tending to weaken the enemy. Presumption of the law of nations is against one who lingers in the enemy's country, and if he continue there for much length of time, without satisfactory explanations, he is liable to be considered as remorant, or guilty of culpable delay, and an enemy.[]
Ships purchased from an enemy by such persons, though claimed to be neutral, are for the same reasons liable to condemnation, unless the delay of the purchaser in changing his domicile is fully and satisfactorily explained. Omission of the appellant to dispose of his interest in the steamer, and his failure to withdraw his effects from the rebellious State, are attempted to be explained and justified, because the same were, as alleged in the petition, confiscated during the rebellion under the authority of the rebel government. More than a year, however, had elapsed after the proclamation *409 of blockade was issued before any such pretended confiscation took place. Members of a commercial firm domiciled in the enemy country, whether citizens or neutrals, after having been guilty of such delay in disposing of their interests or in withdrawing their effects, cannot, when the property so domiciled and so suffered to remain, is captured as prize of war, turn round and defeat the rights of the captors by proving that their own domicile was that of a friend, or that they had no connection with the illegal voyage.
Property suffered so to remain has impressed upon it the character of enemy property, and may be condemned as such or for breach of blockade. Prize courts usually apply these rules where the partnership effects of citizens or neutrals is suffered to remain in the enemy country, under the control and management of the other partners who are enemies. But there are other rules applicable to ships owned under such circumstances which must not be overlooked in this case.
5. Courts and text-writers agree that ships are a peculiar property, and that such peculiarity assumes more importance as a criterion of judicial decision in war than in peace. They have a national character as recognized by the law of nations, because they regularly carry the flag of the nation to which they belong. Evidences of ownership are also peculiar, but vary somewhat according to the laws of the country in which the ships were built, or in which they are owned.[*]
Commercial nations generally have, for the advancement of their own individual prosperity, conferred great privileges upon the ships belonging to their own citizens, and, in consideration thereof, have imposed upon their owners certain special duties and obligations. Usually they are required to be registered at the home port, and they are not allowed to sail on any voyage, foreign or coasting, without such papers as the laws of the country to which they belong require.[]
American vessels sailing for a foreign port are, in all cases, required by law to carry a passport, and it is generally admitted *410 that such a document is indispensable in time of war.[*] When a ship is captured as prize of war she is bound by the flag and pass under which she sailed. Owners are also bound by those insignia of national character. They are not at liberty when they happen to be evidence against them to turn round and deny the character the ship has assumed for their benefit.[]
Established rule is that when the owners agree to take the flag and pass of another country they are not permitted, as matter of convenience, in case of capture, to change the position they have voluntarily chosen, but others are allowed to allege and prove the real character of the vessel. Meaning of the rule is that the ship is bound by the character impressed upon her by the authority of the government from which all her documents issue; and Chancellor Kent says this rule is necessary to prevent the fraudulent mask of enemy's property.[] Adopting that rule, Dr. Lushington held, in the case of The Industrie,[§] that the share of a neutral in ownership, though purchased before the war, was subject to condemnation equally with the shares of enemies in the same ship. Principle of the decision is that whoever embarks his property in shares of a ship is in general bound by the character of the ship, whatever it may be, and that principle is as applicable to a citizen, after due notice and reasonable opportunity to dispose of his shares, as to a neutral.[]
6. Decision of Lord Stowell, in the case of The Mercurius,[¶] was that violation of blockade by the master affects the ship, but not the cargo, unless it is the property of the same owner, or unless the owner of the cargo was cognizant of the intended violation.
Proofs show that the cargo in this case was the property of the same owners, and, therefore, the case being within the principle of that decision, the cargo must follow the fate *411 of the ship. Subsequent cases, however, decided by the same learned judge, appear to have carried the rule much further, and to have established the doctrine in that country that when the blockade was known, or might have been known, to the owners of the cargo at the time when the shipment was made, the master shall be treated as the agent of the cargo, as well as of the ship, and that the former, as well as the latter, is liable to capture and condemnation.[*]
Latest reported decision in that country is that of Baltazzi v. Ryder,[] which was heard on appeal before the privy council, and the determination, both in the admiralty court and in the appellate court, was that where the cargo belonged to the same owners as the ship, the owners of the cargo, as well as the ship, were in general concluded by the illegal act of the master.
Giving full effect to the admissions in this case, the appellant shows no just ground for the reversal of the decree made by the District Court.
7. Since the appeal was entered in this court the other partners have filed a petition here, asking leave to intervene for their interests, and claiming the other five-sixths of the vessel and cargo. They were not parties in the court below, having never appeared in the suit or made any claim whatever, and of course did not, and could not, appeal from the decree. Substance of their excuse for not appearing in the District Court is that they were residents in a State hostile to the United States, and consequently that they had no standing in that court, by reason of such disability. Statement of the petition also is that those disabilities continued till after the case was removed into this court by appeal; but they allege that since that time they have severally received the pardon of the President for all pains and penalties incurred for breach of blockade, and for all offences committed by them in the rebellion, and by reason of the premises they pray that their proportion of the proceeds of *412 the sale of the steamer and cargo may be restored to them. Irrespective, however, of any question which might otherwise arise as to the effect of the pardon, it is quite clear that the case is not properly before the court. Settled rule in this court is that no one but an appellant in such a case can be heard for the reversal of a decree in the subordinate court.[*]
8. Appellees are always heard in support of the decree, but they cannot have any greater damages than were assessed in the court of subordinate jurisdiction. Intervenors here, however, are neither appellants or appellees, as they did not appear as claimants in the District Court, and were not in any way made parties to the litigation. Original jurisdiction in prize, as well as in all other admiralty causes, is vested exclusively in the district courts. Property captured, where appeals are allowed to the Circuit Court, follows the cause into that court, but it does not in any case follow the cause into this court, because this court has no original jurisdiction in such cases.[]
Evidently the application in this case is in its nature original, and not appellate, and it is well settled that this court has no original jurisdiction in prize causes.[] Such an application cannot be first presented in this court and allowed, because it would be assuming jurisdiction not granted either by the Constitution or the laws of Congress.
Petition of intervention is dismissed, and the
DECREE OF THE DISTRICT COURT AFFIRMED.
NOTES
[*] Jecker v. Montgomery, 13 Howard, 498.
[] The Hoop, 1 Robinson, 196; Maclachlan on Shipping, 473; The Rapid, 8 Cranch, 155; Potts v. Bell, 8 Term, 561; Wheaton's International Law by Lawrence, 547.
[*] Helme v. Smith, 7 Bingham, 709.
[] Smith's Mercantile Law, 6th ed. 197.
[] Maude & Pollock on Shipping, 67, 72.
[§] 3 Kent's Com., 11th ed. 154; Wright v. Hunter, 1 East, 20; Lamb v. Durant, 12 Massachusetts, 54.
[] 12 Stat. at Large, 1258, 257.
[*] Maolachlan on Shipping, 475; Story on Partnership, sec. 316; Griswold v. Waddington, 15 Johnson, 57; Same case, 16 Id. 438.
[] Exposito v. Bowden, 7 Ellis & Blackburne, 763.
[*] The Vigilantia, 1 C. Robinson, 1; The Venus, 8 Cranch, 288; 3 Phillimore's International Law, 128.
[] Maclachlan on Shipping, 480; The Ocean, 5 Robinson, 91; The Venus, 8 Cranch, 278.
[*] Wheaton's International Law, by Lawrence, p. 580.
[] Abbott on Shipping, 72.
[*] 1 Stat. at Large, 489. Maude & Pollock on Shipping, 95.
[] Story on Prize, 61; The Elizabeth, 5 C. Robinson, 3; The Fortuna, 1 Dodson, 87; The Success, Id. 132.
[] 1 Kent's Com., 11th ed. 91.
[§] 33 Eng. Law & Eq. 572
[] The Primus, 29 Eng. Law & Eq. 589.
[¶] 1 C. Robinson, 80.
[*] The Alexander, 4 C. Robinson, 94; The Adonis, 5 Id. 259; The Exchange, 1 Edwards's Adm. 39; The James Cook, Id. 261.
[] 12 Moore's Privy Council, 183.
[*] Harrison v. Nixon, 9 Peters, 484; Canter v. Am. Ins. Co., 3 Id. 318; Stratton v. Jarvis, 8 Id. 4; Airey v. Merrill, 2 Curtis's C.C. 8; Allen v. Hitch, 2 Id. 147; Buckingham v. McLean, 13 Howard, 150.
[] Jennings v. Carson, 4 Cranch, 28; The Collector, 6 Wheaton, 194.
[] The Harrison, 1 Wheaton, 298; Marbury v. Madison, 1 Cranch, 173.