Frank J. **ABEL**, individually and d/b/a
Dal-Air and Frank J. Abel Trust,
et al., Appellants,

v.

**BRAYTON FLYING SERVICE, Inc.,**
Appellee.

No. 16477.

United States Court of Appeals
Fifth Circuit.

Oct. 1, 1957.

Rehearing Denied Nov. 15, 1957.

Cameron, Circuit Judge, dissented.

Morris I. Jaffe, Dallas, Tex., for appellants.

Henry D. Akin, Dallas, Tex., Leachman, Gardere, Akin & Porter, Dallas, Tex., for appellee.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, Sr., District Judge.

RIVES, Circuit Judge.

This appeal is from a judgment for the appellee, plaintiff · below, Brayton Flying Service, Inc., against the appellants for the sum of $25,000.00 plus 6% interest from November 19, 1956, the date of trial, together with costs. The judgment also directed the foreclosure of a chattel mortgage securing the indebtedness. For reversal of the judgment, appellants rely upon only one claimed error thus stated in their brief:

> "The Court erred in not allowing offsets in the amount of $5,097.50 usurious interest included in the $25,000.00 judgment and $6,702.30 usurious interest previously paid Appellee by Appellant Abel, * *."

While the appellants have thus not specified as error the overruling by the district court of their motion to dismiss, our brother, Judge CAMERON, who originally undertook the writing of the court's opinion upon this appeal, has reached the firm conclusion that the district court lacked jurisdiction because of the absence of an indispensable party plaintiff, namely Clyde E. Brayton as an individual, whose presence would have destroyed the requisite diversity of citizenship. With that conclusion, the majority does not agree.

■ Upon that threshold question of jurisdiction, as well as upon the merits, it is necessary to consider the entire written contract upon which the action was based. Because of its length, that contract dated April 19, 1955 is attached as an appendix to this opinion. The indebtedness was secured by a chattel mortgage dated April 28, 1955, naming as mortgagee the corporation, Brayton Flying Service, Inc., and covering:

> "all furniture, fixtures, tools, equipment and personal property of whatsoever nature, located in or at or used in connection with the place of business at 3211 Love Field Drive in the City of Dallas, Dallas County, Texas."

The plaintiff rested after introducing the written contract and the chattel mortgage. The defendants called as their witness Clyde E. Brayton himself, who testified that he owned a majority interest in the stock of the plaintiff corporation.[1] In the course of Mr. Brayton's testimony, the defendants introduced in evidence the written memorials of the series of transactions recited in the "whereas" paragraphs of the contract sued on, and dated respectively, September 10, October 14 and November 17, 1954, and January 17 and April 13, 1955. On their face those transactions appeared to be as recited in the contract sued on. Defendants claimed, however, that several of them were mere subterfuges to overcome the Texas usury laws.[2]

Brayton admitted that he had paid Abel only $13,000.00 for the purchase of the B-25 aircraft on September 10, 1954, and that upon its sale on January 17, 1955 he received $19,727.50. If interest, the $6,727.50 profit was more than the

---

1. There was no proof that Brayton was the sole owner or alter ego of the corporation.

2. "Article 5069. * * * Definitions
" 'Interest' is the compensation allowed by law or fixed by the parties to a contract for the use or forbearance or detention of money: 'legal interest' is that interest which is allowed by law when the parties to a contract have not agreed upon any particular rate of interest; and 'conventional interest' is that interest which is agreed upon and fixed by the parties to a written contract, not to exceed ten per cent per annum. 'Usury' is interest in excess of the amount allowed by law; all contracts for usury are contrary to public policy and shall be void."
"Art. 5071. * * * Limit on rate
"The parties to any written contract may agree to and stipulate for any rate of interest not exceeding ten per cent per annum on the amount of the contract; and all written contracts whatsoever, which may in any way, directly or indirectly, provide for a greater rate of interest shall be void and of no effect for the amount or value of the interest only; but the principal sum of money or value of the contract may be received and recovered."

Revised Civil Statutes of Texas, Title 79.

ten per cent permitted by the Texas statutes. (Footnote 2, supra). The answer is, however, that there was no evidence going to show that the earliest contract between Abel and Brayton, dated September 10, 1954, was anything different from what it appeared to be, namely a sale by Abel to Brayton of a "B-25" aircraft with an option to Abel, but no obligation upon him, to repurchase. That form of contract could very well be used as a cloak to conceal usury, but there should be some evidence to that effect.[3]

Further, the contract sued on stated in writing over the signature of both Abel and Brayton that a bona fide dispute existed and an accord and satisfaction had been reached.[4] In the absence of any countervailing evidence, we cannot say that it would be clearly erroneous to hold such a written statement sufficient to meet the burden resting upon a party asserting an accord and satisfaction to prove that a bona fide dispute existed.[5] Indeed, the Texas law seems to be that "A party to a written settlement may not contend that there was no dispute to compromise, when the instrument clearly recites the grounds for the settlement, and he deliberately signed and acknowledged it." 1 Texas Jurisprudence, Accord and Satisfaction, § 32, p. 274, citing Ferguson v. Ragland, Tex. Civ.App., 243 S.W. 721, see page 723.

Appellants urge also that there was no consideration for the alleged accord and satisfaction. Brayton had advanced to Abel $1,800.00 on April 13, 1955. On April 19th, Brayton advanced to Brayton Flying Service, Inc. an additional $18,-102.50, which in turn gave its check for that amount to Abel and the Director of Internal Revenue at Dallas. In addition, the contract of April 19th provided that in lieu of fifty per cent of the net profit from the sale of the Stearman aircraft and the 83 T-6's Brayton Flying Service, Inc. would receive $2,000.00 per aircraft plus thirty per cent of the gross sales price of those aircraft to which were added 19 other T-6's owned by Abel and certain T-6 fuselages, wings, engine mounts and parts. Actually that exchange proved advantageous to Brayton Flying Service, Inc., but there was no showing that it could not have been advantageous to Abel if the market for such things had gone differently before they were sold. In addition, Brayton Flying Service, Inc. obtained security on the 19 other T-6's and on all furniture, fixtures, tools, equipment, and personal property used in connection with appellants' business. Brayton Flying Service, Inc. further agreed that in lieu of the $125,000.00 to be paid from the proceeds of sales of aircraft and parts, it would accept the sum of $50,000.00 as full payment before November 1, 1955 or the sum of $100,000.00 before the end of the calendar year of 1955. There was no evidence to show that such agreements were actually of no value. We think that there was ample consideration for the accord and satisfaction.

That is true also as to the other promises on Abel's part contained in the contract of April 19, 1955, including the promise to pay the $25,000.00 which formed the basis for the judgment from which this appeal is prosecuted. That $25,000.00 exceeded the $19,902.50 paid to Abel by $5,097.50, which, if interest, was more than the permissible ten per cent (footnote 2, supra). Again, however, there is no sufficient evidence to require a finding that such profit was interest or that the contract of April 19, 1955 did not speak the truth or was in any way a subterfuge. If Abel really thought so, he completely failed to explain his failure to take the stand and so testify.

Several of the issues which have been discussed involved Brayton as an in-

---

3. Mays v. Pierce, 154 Tex. 489, 281 S.W. 2d 79, 81, 82; Gholson v. Peeks, Tex. Civ.App., 224 S.W.2d 778, 779.

4. See the last "whereas" paragraph in the contract attached as an appendix.

5. Stewart v. Friona State Bank, Tex.Civ. App., 278 S.W.2d 425, 433; 1 Texas Jurisprudence, Accord and Satisfaction, § 31, p. 274.

dividual. We shall hereafter point out that Brayton could have been made a cross defendant without depriving the district court of jurisdiction. While that was not done, the issues treated were argued, and apparently tried, by the implied consent of the parties and those issues should therefore be treated as if raised by the pleadings. Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

■■ For a clearer understanding of the dealings between the parties, we have thought it more convenient to reverse the logical order and to discuss the merits before expressing the views of the majority on the point raised by Judge Cameron that the district court lacked jurisdiction because the individual Clyde E. Brayton was an indispensable party plaintiff.[6] As we view the case, he was not even a proper party plaintiff. The promise to pay the $25,000.00 upon which the judgment was based ran to the corporation alone, Brayton Flying Service, Inc. As between Brayton Flying Service, Inc. and Clyde E. Brayton the contract attached as an appendix was clearly several rather than joint.[7] The promises to pay upon which this action is based were contained in paragraph numbered III of the contract (see appendix) and ran solely to Brayton Flying Service, Inc. Similarly, the chattel mortgage securing the payment of the $25,000.00 named as the sole mortgagee, Brayton Flying Service, Inc.

■ The rule has been long settled that "When a contract has been made with several persons under which a separate duty arises to each, in contemplation of law it is the same as if a separate and distinct contract had been entered into with each separately, and they must sue separately." 39 Am.Jur., Parties, § 31, pp. 894, 895.[8]

■ Further, no injustice was worked on Abel by the omission of Brayton as a party plaintiff. Any relief to which Abel might have been entitled against Brayton arose out of the transactions which formed the subject matter of the suit. A counterclaim for such relief would have been auxiliary to the action of which the district court already had jurisdiction and needed no independent jurisdictional ground to support it.[9] Abel did not avail himself of the right to file such a counterclaim and cannot now complain. Especially is that true, since, as we have seen, the really pertinent issues between Abel and Brayton were tried by implied consent and have been considered pursuant to Rule 15(b), Federal Rules of Civil Procedure.

■ Finally, under a so-called "cross-assignment of error" the appellee urges " * * * that the portion of the judgment allowing interest on $19,-902.50 of the $25,000.00 judgment at the rate of 6% from the date of the judgment be reformed and rendered for 10% interest on said $19,-

6. We may assume that we should consider the alleged lack of an indispensable party though not urged on appeal. The party was not added and actual diversity persisted. It may be therefore, that the point could be waived. See Mastercrafters Clock & Radio Co. v. Vacheron & Constantine—Le Coultre Watches, Inc., 2 Cir., 1955, 221 F.2d 464, 467. In any event, however, we have the option to and will notice the denial of the motion to dismiss as a plain error though not specified, if in fact an error was committed which resulted in an erroneous assumption of jurisdiction. See Rule 24, subd. 2(b) of the Court of Appeals for the Fifth Circuit, 28 U.S.C.A.

7. See 10 Texas Jurisprudence, Contracts,

§§ 192, 277; 12 Am.Jur., Contracts, § 269; 17 C.J.S. Contracts §§ 352(b), 355 (b).

8. See also Hall v. Leigh, 8 Cranch 50, 12 U.S. 50, 3 L.Ed. 484; Shipman v. Straitsville Cent. Mining Co., 158 U.S. 356, 360, 15 S.Ct. 886, 39 L.Ed. 1015; 37 Tex.Jur., Parties, §§ 22, 24; 67 C.J.S. Parties § 24; 47 C.J. p. 61; Annotation 9 L.R.A. 704; Rule 19, Federal Rules of Civil Procedure.

9. Moore v. New York Cotton Exchange, 270 U.S. 593, 609, 46 S.Ct. 367, 70 L. Ed. 750; United Artists Corporation v. Masterpiece Productions, 2 Cir., 1955, 221 F.2d 213, 217; Lenz v. Wagner, 5 Cir., 1957, 240 F.2d 666, 669; Rule 13 (a), Federal Rules of Civil Procedure.

902.50 out of the $25,000.00 from April 19, 1955 until paid * * *."

Judge Sibley called attention years ago that the Texas rule permitting an appellee to cross-assign errors without himself appealing has no application in the federal courts.[10] It has been repeatedly held that, in the absence of a cross-appeal, appellee may not attempt either to enlarge his rights under the judgment appealed from or to lessen the rights of appellants.[11]

It results that the judgment appealed from should be and the same hereby is

Affirmed.

CAMERON, Circuit Judge (dissenting).

I do not think the Court below had jurisdiction of this diversity action for the reason that Clyde E. Brayton, a citizen of Texas, was an indispensable party. The question was raised by a timely motion to dismiss which the Court below denied. In my opinion, the motion should have been granted and the action should have been dismissed on jurisdictional grounds which confronted the Court below and confront this Court as the first order of business at every stage of the proceedings.

The contract sued on was an entire contract signed by Abel and his Trustees as First Parties, and by Clyde E. Brayton, individually, and Brayton Flying Service, Inc. (by Clyde E. Brayton, President) as Second Parties, and was in the nature of a compromise of disputes then existing between all of the parties.[1]

The "aforesaid contracts" mentioned in the quotation were the contract of September 10, 1954 between Clyde E. Brayton and Frank J. Abel under which said Brayton purchased from said Trust a B-25 Airplane, and granted Abel the right to repurchase or dispose of same within a specified time;[2] the contract of October 14, 1954 between Frank J. Abel and the plaintiff corporation referring to the intention of the parties to purchase from one to fifteen Stearman Aircraft, and covering the purchase of one such plane for rebuilding and sale after overhauling, the corporation to furnish the money for the purchase and Abel to furnish the manpower for the overhauling, the sale to be for the equal benefit of both, and providing further that the corporation would withdraw fifty per cent of such total expenditure from the amount realized from the *sale of the B-25 Aircraft* covered by the contract

**10.** Bryant v. Massachusetts Bonding & Ins. Co., 5 Cir., 1946, 158 F.2d 967, 969.

**11.** The William Bagaley, 1866, 5 Wall. 377, 72 U.S. 377, 18 L.Ed. 583; Helvering v. Pfeiffer, 1937, 302 U.S. 247, 58 S.Ct. 159, 82 L.Ed. 231; Kingory v. United States, C.C.La.1891, 44 F. 669; Calder v. Henderson, 5 Cir., 1893, 54 F. 802; Orient Petroleum Co. v. Wichita State Bank & Trust Co., 5 Cir., 1927, 17 F.2d 263, denying rehearing 5 Cir., 16 F.2d 417; Likins v. Jefferson Standard Life Insurance Co., 5 Cir., 1934, 69 F. 2d 98; Arkansas Fuel & Oil Co. v. Leisk, 5 Cir., 1943, 133 F.2d 79, 81; Browne v. Makin, 5 Cir., 1949, 177 F.2d 753, 756; United States v. Scrinopskie, 5 Cir., 1950, 179 F.2d 959; Hall v. Keller, 5 Cir., 1950, 180 F.2d 753; see Tuschman v. Pennsylvania Railroad Co., 3 Cir., 1956, 230 F.2d 787; 28 U.S.C.A. § 1291, Note 19.

**1.** "Whereas, there exists a bona fide dis-

pute as to the standing of accounts and indebtedness as between the parties and as to the performance or nonperformance of the aforesaid contracts, *each claiming the other is indebted to him or it* by reason thereof, and *it is the desire of all the parties* hereto that all matters in dispute between the *First Parties* and the *Second Parties* be finally compromised, settled and adjusted and that a new agreement be entered into by and between *the parties hereto* by which their rights and obligations will ge governed hereafter * * * this new contract being accepted in full accord and satisfaction of all actual or potential claims, * * *." [Emphasis added.]

**2.** The contract was signed by Clyde E. Brayton and Frank J. Abel as individuals, and Clyde E. Brayton signed a receipt dated January 17, 1955 reciting that he had received from Frank J. Abel the sum of $19,727.50 covering said aircraft.

first above-mentioned;[3] and an agreement dated November 17, 1954 between Frank J. Abel and the corporation dealing with the purchase of T-6 airplane fuselages, wings and miscellaneous parts, to be handled and sold with equal division of profits. Said contract also granted the corporation the right to withdraw fifty percent of the total expenditure *from the B–25 transaction* and the Stearman transaction.[4]

The compromise agreement sued on recited that Clyde E. Brayton had advanced Abel $1,800.00 April 13, 1955 by check payable to Abel and the Director of Internal Revenue and that said Brayton "agrees to 'advance'[5] to Brayton Flying Service, Inc., which in turn agrees to pay to Frank J. Abel in addition to said $1,800.00 advanced as aforesaid * * * the sum of $18,102.50 in cash contemporaneously with the execution of this contract and the bill of sale and chattel mortgage hereinafter referred to, to be evidenced by a check payable to said Frank J. Abel and the Director of Internal Revenue at Dallas."[6] Said agreement also contained a mutual release of all obligations theretofore existing between the parties to it[7] which, of course, included Brayton individually.

The compromise agreement sued on also obligated Abel to pay the corporation $25,000.00 within one hundred twenty days with ten per cent interest on $19,902.50, and recited that a part of the consideration besides the money advanced was "the surrender *by Second*

---

3. This contract of October 14th was signed by Clyde E. Brayton above the typewritten name, "Brayton Flying Service, Inc." and by Frank J. Abel; on January 17, 1955, Clyde E. Brayton *individually* signed a receipt to Frank J. Abel acknowledging the payment of $17,598.22 covering "payment in full through this date per contracts dated *October 14, 1954 covering Stearman Aircraft* and *November 17, 1954 covering T-6 Aircraft* and personal loan advanced on B-25 * * *" [Emphasis added.]

4. This agreement of November 17, 1954 was signed by Clyde E. Brayton, President, and by Frank J. Abel, and recites: "It is understood that Clyde E. Brayton has personally arranged the financing of the money involved in this venture."

5. Quotation marks supplied.

6. Although the contract recited that Brayton agreed to "advance" to the corporation, which it in turn agreed to "pay" to Frank J. Abel, the evidence shows that Brayton paid the money direct to Abel, this being his testimony:
   "Q. So when you made the contract on April 19, 1955, you advanced the total of $19,902.50, did you not?
   A. Yes.
   Q. That was made out in two checks, was it not?
   A. I believe they were made out in three checks.
   Q. To whom were they made out?
   A. To Frank J. Abel, the Director of Internal Revenue, and the Abel Trust. * * *"
   Moreover, although the contract of October 14, fn. 3 *supra*, was executed by

Brayton as President of the corporation, thus obstensibly lodging in the corporation the interest in the Stearman and T-6 aircrafts, appellee's attorney stated to the Court: "The $25,000.00 represented not only the $19,902.50, which Mr. Brayton, or which Brayton Flying Service, had advanced to defendant; but also was in consideration of *Mr. Brayton* giving up a fifty per cent interest in the airplanes and agreeing to accept twenty percent of the sales price of the parts, and $2,000.00 for each of the T-6 airplanes that were sold and $2,000.00 for a Stearman airplane that was sold * * *" [Emphasis added.]

At another place Brayton testified: "He was supposed to pay me thirty per cent of the gross sales of the T-6 aircraft parts." In fact, the identification of Brayton as the chief party in interest went so far that when the Court below called the case and attorney for appellants stated, in answer to the question: "Are these witnesses parties in some way?"—"These two are parties, Your Honor."; the attorney for appellee stated: "And Mr. Brayton is a party, Your Honor."

7. "And First Parties and Second Parties, for themselves, their heirs, executors and administrators release and discharge each other from all manner of debts, demands, obligations, liabilities, suits and causes of action whatever against the other * * * save and except the revised obligations herein set forth."

*Parties* of their rights to an equal division of the profits from the sale of the said T-6's," and provided further that *"Second Parties* will execute and deliver to First Parties a bill of sale covering all of the aircraft and parts then remaining on hand." [Emphasis added.] Brayton was one of the Second Parties upon whom these obligations were imposed.

The original and amended complaints recited that defendants had breached the compromise agreement by failing to pay the $25,000.00 with interest, to furnish inventories of the T-6 aircraft and parts, to account for plaintiff's portion of the sales of said aircraft and parts, and to perform other obligations contained in said agreement. The relief asked was a personal judgment against defendants (appellants) for $25,000.00 and "foreclosure of its chattel mortgage and contract lien and establishing title in plaintiff to said aircraft and parts;" that defendants be enjoined from disposing of any of the mortgaged property and be required to render a full accounting for all parts sold by them, and for "such other and further relief, special and general, in law and in equity to which it may be justly entitled."

Their motion to dismiss for absence of indispensable parties having been denied, appellants answered the amended complaint denying its charges that they had failed to furnish inventories or to account for plaintiff's portion of monies derived from sales of the T-6 aircraft parts and that plaintiff was entitled to any relief by injunction. The answer averred that the contract sued on was without consideration, was a subterfuge and an effort to cover up usurious interest in a large amount provided for in said agreement sued on and also in the contract of September 10, 1954 between Abel and Clyde E. Brayton individually; that the four contracts were a series of connected transactions between the parties and that appellants were entitled to protection with respect to a large amount of usurious interest allegedly mulcted from them by Brayton individually.

In a long line of decisions [8] this Court has considered the manifold phrases of the question of indispensable parties, and has established principles which apply to and furnish the yardstick by which the facts here should be measured. These may be epitomized as follows:

The question of jurisdiction arises at the threshold of the case and remains constantly before the court until final judgment. Choice of jurisdiction belongs primarily to the plaintiff and a court of equity will strain hard to sustain an invoked jurisdiction. Federal jurisdiction, being statutory and limited, must clearly appear and the plaintiff carries the burden of sustaining that jurisdiction. A precarious jurisdiction which limits the scope of decision on the merits will not be entertained. A suit upon a written contract will not be entertained in the absence of any party to it if the relief which may be granted will have a direct effect upon his interest therein; and relief will not be granted in his absence either by way of cancellation, reformation, specific performance or by enforcement in any manner, of a contract which is entire or indivisible; but the court will proceed to grant the litigant invoking its jurisdiction such relief as is separable,—as in the case of a claim to a fractional and divisible share —and will not affect the rights of the absent party, provided the controversy will not be left in such a condition that

---

8. Vincent Oil Co. v. Gulf Refining Co., 5 Cir., 195 F. 434; Seeley v. Cornell, 5 Cir., 74 F.2d 353; Keegan v. Humble Oil & Refining Co., 5 Cir., 155 F.2d 971; Calcote v. Texas Pacific Coal & Oil Co., 5 Cir., 157 F.2d 216, certiorari denied 329 U.S. 782, 67 S.Ct. 205, 91 L.Ed. 671; Chance v. Buxton, 5 Cir., 163 F.2d 989; Id., 5 Cir., 170 F.2d 187; Hudson v. Newell, 5 Cir., 172 F.2d 848; Young v. Powell, 5 Cir., 179 F.2d 147; Tucker v. National Linen Service Corp., 5 Cir., 200 F.2d 858; Mackintosh v. Marks Estate, 5 Cir., 225 F.2d 211; Estes v. Shell Oil Co., 5 Cir., 234 F.2d 847; Stewart v. United States of America, 5 Cir., 242 F. 2d 49. And see Rule 19, F.R.C.P.

its final termination may be inconsistent with equity and good conscience. The question of indispensable parties will be decided upon fundamental equitable principles, but it embraces the question of jurisdiction when diversity is the sole basis of federal jurisdiction.

There is no prescribed formula for determining whether a party is indispensable, and the question must be determined by the facts of each individual case. One of the most cited cases on the subject is a decision rendered by the Supreme Court in 1854 in Shields v. Barrow, 17 How. 129, 58 U.S. 129, 15 L.Ed. 158, and its facts bear a sufficient resemblance to those here to warrant quoting some of its language. Shields, a citizen of Mississippi, had bought a large plantation in Louisiana from Barrow, and had paid nearly half the purchase price when he defaulted on some payments due, and Barrow had sued him for and obtained foreclosure and money judgment. The proceedings were then compromised by Shields' execution of notes to Barrow with six endorsers.

Barrow, a citizen of Louisiana, brought suit after default in payment of the new notes against two of the endorsers residing in Mississippi, but omitted four of the endorsers who were citizens of Louisiana. The two sued filed a crossbill against the other four endorsers, tendering payment of their proportionate parts. The trial court took jurisdiction of both the original action and the cross bill, rendering judgment on the merits. The Supreme Court reversed, in part because "The contract of compromise was one entire subject;" [17 How. at page 138] and because the rights of those before the court were not "completely separable from the rights of those absent * * *" [17 How. at

page 140]. The Supreme Court was further of the opinion that the absent endorsers had an interest in the proceedings which was "of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." 17 How. at page 139.

The application of the foregoing principles makes it clear that Clyde E. Brayton was an indispensable party to this action. The analysis of the contract sued on [9] demonstrates that the relief sought by the plaintiff was not divisible or separable from the rights belonging to Brayton under it; but that there was community of ownership and interest between him and the corporation in all of the contract provisions; and that the contract conferred upon appellants reciprocal rights which could not be enforced or protected in a suit Brayton caused to be brought by the corporation and from which he omitted himself.[10]

In essence, the contract sued on was the memorial of the compromise settlement of basic differences and disputes between Brayton and the corporation on the one side and appellants on the other. The three contracts giving rise to those disputes were either executed by Brayton alone, or by him as an officer of the corporation. He put up individually all of the money involved in all of the contracts, and he personally collected and receipted for all of the money deriving from them. In the compromise agreement, he acknowledged in effect his ownership of the rights accruing to the corporation from the old contracts by joining in a conveyance of those rights to appellants. The money theoretically advanced to the corporation under the

9. Our task would be simpler if appellee had complied with the provisions of Rule 19(c), F.R.C.P.: "In any pleading in which relief is asked, the pleader shall set forth the names, if known to him, of persons who ought to be parties if complete relief is to be accorded between those already parties, but who are not joined, and shall state why they are omitted."

10. Brayton was majority stockholder in Brayton Flying Service, Inc., was its president and the sole officer appearing on its stationery, and acted entirely for it in all of the matters involved in this litigation. Defendants alleged that he was sole owner of the corporation.

compromise was weighted with limitations as to what the corporation could do with it; it could be used only as directed by Brayton and for his benefit; and the security provided for was for his benefit and protection.

Whether Brayton was using the corporation as a conduit through which his enterprises were carried out, or he was a partner or joint-venturer with the corporation in the business deals compromised in the compromise agreement, the result is the same. Moreover, one of the chief considerations moving the appellants to the execution of the compromise agreement was the release under its terms of all of Brayton's individual claims against them. By the expedient of omitting himself from the suit and directing its prosecution in the name of the corporation alone, he and his corporation created a situation under which the appellants would be forced to yield the last full measure of their obligations under the contract while being denied the chief protection which was reciprocally theirs.

I am unable to agree with the majority in its position that jurisdiction was conferred on the Court below either by the trial of pertinent issues between the parties "by the implied consent," or because "Abel did not avail himself of the right to file such a counterclaim [that is, against Brayton, individually] and cannot now complain." Of course jurisdiction cannot be conferred by consent, and the question of jurisdiction will be raised by the court of its own motion where the parties have not raised it.

The right of counterclaim exists only against the plaintiff who has brought the action, and Abel did not assert, and apparently did not have, any counterclaim against the corporation. What he asserted was a defense based upon want of consideration and upon usury. The

pleadings and evidence do not reveal any counterclaim appellants had or desired to assert against Brayton individually. Even if they had attempted to file a counterclaim against him, the Court would not have permitted him to be brought in because the identity of citizenship between him and appellants would "deprive the court of jurisdiction of the action." Rule 13(h), F.R.C.P.; Reynolds v. Maples, 5 Cir., 1954, 214 F.2d 395, 399.[11]

*A fortiorari,* where, as here, the absent party is not only subject to the jurisdiction and process of the court, but is the instigator of the action in the name of the party with respect to which he is indispensable, a court of equity will not proceed in his absence. Such a course of piecemeal enforcement of an entire contract would, under the authorities cited, be "wholly inconsistent with equity and good conscience."

In my opinion, the judgment of the lower Court should be reversed and the action dismissed. Where the question involves so important a matter as jurisdiction, I am compelled to dissent.

### APPENDIX

"The State of Texas,
County of Dallas.

"This contract and agreement made and entered into this the 19th day of April, 1955, by and between Frank J. Abel, individually and doing business as Dal-Air, and Frank J. Abel Trust, hereinafter jointly and severally referred to as First Parties, and Clyde E. Brayton and Brayton Flying Service, Inc., hereinafter jointly and severally referred to as Second Parties, all of Dallas County, Texas,

### Witnesseth:

"Whereas, in accordance with the terms of a written contract dated the 10th day of September, 1954, Frank J.

---

11. A good way to test the question of indispensable parties is to examine the situation as it would be in reverse. Suppose Abel had brought an action against the corporation to cancel or modify the contract sued on or for a declaratory judgment as to its terms and meaning. Brayton would have been an indispensable party to such an action because his interests would have been directly affected by any relief which the court could grant.

Abel sold to Clyde E. Brayton that certain North American aircraft, Serial No. 43–4645, hereinafter referred to as said B-25, and said Clyde E. Brayton granted to said Frank J. Abel the right to repurchase said B-25 for $19,500.00 within 120 days, and for $19,500.00 plus $32.50 for each day over 120 days, for an additional 60 days;

"Whereas, thereafter, Brayton Flying Service, Inc., advanced certain monies for the purchase in its name and rebuilding of one Stearman aircraft, hereinafter referred to as said Stearman, and by written contract dated the 14th day of October, 1954, Frank J. Abel agreed that upon the sale of said B-25, the said Brayton Flying Service, Inc., was to receive from such sale 50% of the total expenditure on said Stearman as reimbursement, and Brayton Flying Service, Inc., agreed to convey to the Frank J. Abel Trust an undivided one-half interest in and to said Stearman;

"Whereas, thereafter, Brayton Flying Service, Inc., advanced the money to Frank J. Abel to purchase 83 certain T-6 fuselages and wings, hereinafter called said T-6's, and one lot of T-6 miscellaneous parts, and by written agreement entered into on the 17th day of November, 1954, between Frank J. Abel and Brayton Flying Service, Inc., Frank J. Abel agreed that upon the sale of said B-25, Brayton Flying Service, Inc., was to withdraw from the proceeds of such sale 50% of the total expenditure on said T-6 venture as a reimbursement;

"Whereas, each of said last two mentioned written contracts provided for an equal division of profits after all indebtedness and encumbrances are satified;

"Whereas, thereafter, on or about January 17, 1955, the sale of said B-25 was consummated and said Frank J. Abel exercised his option to repurchase same from Clyde E. Brayton for the sum of $19,727.50, and paid Brayton Flying Service, Inc., $17,598.22 in payment of one-half the money advanced under said contracts of October 14, 1954, and November 17, 1954, and on said 17th day of January, 1955, upon the direction of

Frank J. Abel, Brayton Flying Service, Inc., executed a bill of sale to the Frank J. Abel Trust to an undivided one-half interest in and to said Stearman and said 83 T-6's;

"Whereas, said First Parties have since said date purchased 19 additional T-6 aircraft;

"Whereas, on or about April 13, 1955, Clyde E. Brayton advanced to Frank J. Abel $1,800.00 by his check payable to Frank J. Abel and the Director of Internal Revenue and has received in return a bill of sale to said Stearman; and,

"Whereas, there exists a bona fide dispute as to the standing of accounts and indebtedness as between the parties and as to the performance or nonperformance of the aforesaid contracts, each claiming the other is indebted to him or it by reason thereof, and it is the desire of all the parties hereto that all matters in dispute between the First Parties and the Second Parties be finally compromised, settled and adjusted and that a new agreement be entered into by and between the parties hereto by which their rights and obligations will be governed hereafter, this being a negotiated contract made in the presence of counsel for both parties; and this new contract being accepted in full accord and satisfaction of all actual or potential claims:

"Now, Therefore, Know All Men By These Presents: That it is mutually agreed by and between the parties hereto as follows:

I.

"Clyde E. Brayton agrees to advance to Brayton Flying Service, Inc., which in turn agrees to pay to Frank J. Abel, in addition to said $1,800.00 advanced as aforesaid on April 13, 1955, the sum of $18,102.50 in cash contemporaneously with the execution of this contract and the bill of sale and chattel mortgage hereinafter referred to, to be evidenced by a check payable to said Frank J. Abel and the Director of Internal Revenue at Dallas.

## II.

"First Parties agree to execute contemporaneously herewith and/or upon demand hereafter the necessary or proper instruments to convey to Brayton Flying Service, Inc., the full title to said 83 T-6's as well as the additional 19 T-6's purchased by Frank J. Abel and all T-6 fuselages, wings, engine mounts and parts in anywise belonging to First Parties.

## III.

"In consideration for said money advanced and the surrender by Second Parties of their rights to an equal division of the profits from the sale of said Stearman and said T-6's First Parties unconditionally agree to pay to Brayton Flying Service, Inc., the sum of $25,000.-00 in cash at Dallas, Texas, on or before 120 days from the date hereof, together with interest on $19,902.50 from the date hereof at the rate of 10% per annum, to be reduced to 6% per annum if said $25,000.00 is fully paid before 120 days from the date hereof, and in addition to such $25,000.00 cash payment, Brayton Flying Service, Inc., shall receive from the proceeds of the sale of said Stearman, said T-6's and/or said T-6 parts, the sum of $2,000.00 out of the proceeds of the sale of said Stearman and/or each of said T-6's and 30% out of the gross sale price of any and all T-6 parts which may be sold, until it is paid the additional sum of $125,000.00 out of such sales. Such additional sum of $125,000.00 is to be paid from the proceeds of sales of said aircraft and parts, if, as and when sold, and is not a personal obligation like the aforesaid $25,000.-00 is, and upon the payment of said sum, Second Parties will execute and deliver to First Parties a bill of sale covering all of the aircraft and parts then remaining on hand. First Parties upon receiving a bill of sale from Second Parties to the remaining aircraft and parts will immediately remove all of same from the premises of Second Parties. In this connection, it is further understood and agreed that Brayton Flying Service, Inc., shall be entitled to the same amount of money from the exchange of any of said aircraft or parts as it is upon the sale of any of said aircraft or parts. If a sufficient amount of said aircraft and parts should not be sold within two years from the date hereof to pay Brayton Flying Service, Inc., said $125,000.-00 in full, or if it is not fully paid as hereinafter alternatively provided in paragraph VII hereof, then First Parties shall have no further right, title, interest or claim in or to said remaining aircraft or parts, but same shall belong solely and unconditionally to Brayton Flying Service, Inc.

## IV.

"First Parties agree to devote the utmost of their skill and power and use every reasonable means to expedite the preparation for sale and the sale of said aircraft and parts, giving their preferential time and efforts to such undertaking.

## V.

"Brayton Flying Service, Inc., agrees to execute a bill of sale to said Stearman and to each of said T-6's as and when sold upon request of First Parties upon receipt of or satisfactory arrangements for the payment to it of $2,000.00 for each of said aircraft sold. In case it is necessary for First Parties to use said aircraft as security in order to obtain bank financing to complete any contract in reference to said aircraft, Brayton Flying Service, Inc., will assign and convey said aircraft to a banking institution with the understanding that such bank is to hold $2,000.00 out of the sale of each of said aircraft for the account of said Brayton Flying Service, Inc.

## VI.

"First Parties hereby grant to Brayton Flying Service, Inc., and agree to execute a chattel mortgage on all furniture, fixtures, tools, equipment and personal property of whatsoever nature located in or at or used in connection with their place of business at 3211 Love Field Drive in the City of Dallas, Dallas County, Texas, in favor of Brayton Flying Service, Inc., to secure the payment

of said $25,000.00 in accordance with the terms hereinbefore set out, said chattel mortgage to be on the common form in use in the State of Texas, and to be released upon the payment of said $25,000.00 and interest thereon.

### VII.

"Anything herein to the contrary notwithstanding, if in addition to the $25,000.00 to be paid in 120 days as aforesaid, First Parties should pay Brayton Flying Service, Inc., the sum of $50,000.00 before November 1, 1955, or the sum of $100,000.00 before the end of the calendar year of 1955, including any $2,000.00 payment or payments made on sale of aircraft or payments made on sale of parts, then Brayton Flying Service, Inc., will accept same in lieu of the aforesaid $125,000.00, and will execute a bill of sale to all remaining aircraft and parts involved herein to First Parties, who shall immediately take possession of same and remove all of same from Second Parties' premises.

### VIII.

"First Parties agree to furnish Brayton Flying Service, Inc., a general inventory of all of said T-6 aircraft and parts on hand and to keep it advised in reference to any prospects or developments in any way affecting or capable of affecting the sale or possibility of sales of said Stearman and said T-6's, whether good, bad or indifferent, and to report all sales or contracts of sale of said Stearman and said T-6's immediately upon receipt of same.

### IX.

"And First Parties and Second Parties, for themselves, their heirs, executors and administrators release and discharge each other from all manner of debts, demands, obligations, liabilities, suits and causes of action whatever against the other in any manner claimed, owned, held or possessed by either of First Parties against either of Second Parties, or by either of Second Parties against either of First Parties, save and except the revised obligations herein set forth.

### X.

"First Parties warrant and represent that Brenner Aircraft Service has no interest or claim in and to said Stearman, T-6's or parts conveyed to Brayton Flying Service, Inc., or said personal property included in said mortgage.

### XI.

"To the full and proper performance of all their respective agreements and stipulations herein contained, the parties hereto bind themselves, their heirs, successors, executors, administrators and assigns.

"In Witness Whereof, the parties hereto have caused these presents to be executed in duplicate originals, one of which is delivered to First Parties and one of which is delivered to Second Parties this the day and year herein first above written.

"(S.)   Frank J. Abel,
"(Frank J. Abel),
"Frank J. Abel Trust,
"By  (S.)   Kenneth J. Brenner,
"By  (S.)   Margaret McLendon,
"By........................,
"Trustees.
"Dal-Air,
"By  (S.)   Frank J. Abel,
"Sole Owner,
"First Parties.
"(S.)   Clyde E. Brayton,
"(Clyde E. Brayton),
"Brayton Flying Service, Inc.,
"By  (S.)   Clyde E. Brayton,
"President,
"Second Parties."

Rehearing denied: CAMERON, Circuit Judge, dissenting.